**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BAKER HOTEL OF DALLAS, INC., Respondent.**

No. 19456.

United States Court of Appeals
Fifth Circuit.
Jan. 3, 1963.

Stuart Rothman, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Glen M. Bendixsen, Marion Griffin, Attys., N. L. R. B., Washington, D. C., for petitioner.

Carl B. Callaway, Joe P. Mathews, Dallas, Tex., for respondent.

Before TUTTLE, Chief Judge, and WISDOM and GEWIN, Circuit Judges.

TUTTLE, Chief Judge.

This is a petition by the Labor Board for enforcement of its order to cease and desist and requiring the respondent to reinstate a discharged employee, Vivian Hampton.

██ We are met at the threshold of our consideration of the case by respondent's attack on the jurisdiction of the Board over its hotel operations. We conclude that the admitted fact that respondent during the applicable period, purchased directly from outside the State materials valued in excess of $10,000 clearly brings the respondent's operations within the language of the act as affecting commerce and thus statutory jurisdiction of the record before the Board is established. See Optical Workers' Union, etc. v. N.L.R.B., 5th Cir., 227 F.2d 687.

██ On the principal issue as to whether the Board's finding of a discriminatory discharge is supported by substantial evidence on the record as a whole, we state the following facts which the examiner and the Board would be fully warranted to find on the testimony.

On about May 30, 1960, the Union started with an effort to organize the 600 odd employees of respondent's hotel company. Mr. Baker, the general manager of the Baker Hotel of Dallas, Inc., at that time held meetings in groups of employees beginning June 1 for the purpose of expressing clearly and plainly its opposition to the union. Nothing in the advocacy of the company's position was of itself outside the range of permitted activity. On June 2, the waitress, Vivian Hampton, who had been with the company working in its coffee shop for some thirteen years, except for a period of absence when she was in California working under union conditions, was heard by Mrs. Kirk, the coffee shop manager, advocating membership in the Union while talking to other waitresses in the employees' lounge. Thereupon, Mrs. Kirk told Vivian that she could think what she wanted but that she should not discuss union on the floor. The term, "floor" was considered by all involved to include not only the floor of the coffee shop, but also the small kitchen adjacent thereto. On June 5, a Sunday, Mrs. Hampton came to work a little later than her customary hour, having called in to say that she would be late. Upon going into the kitchen, she heard the chief cook of the coffee shop, one Ralph Landon, making comments critical of the union. On several incursions into the kitchen, she found this discussion led by Landon continuing, the burden of his comments being directed to other kitchen employees and to whomever came into the kitchen. Upon his making comments particularly to Negro employees in the kitchen, in which he said that the union would be segregated and that the employees would lose their bonuses, Mrs. Hampton engaged in rebuttal and there was a "fast and furious" exchange between her and Landon. During the course of this exchange, she called Landon a "yellow coward" when he stated that he would get the benefits of a union but would not have to join or pay his dues.

Mrs. Kirk was not on duty on Sunday and the coffee shop was managed by a Mrs. Cobb. Although all of the other waitresses identified the time of this argument as between 12 and 1 o'clock and none of them testified that it was loud enough to be disturbing to patrons in the coffee shop, Mrs. Cobb testified that she heard an argument between Vivian and Ralph Landon between 9:30 and 10:00, but she heard none later in the day. She testified that it was loud enough to cause her to go into the kitchen and "shush" the participants. She

told them to return to their stations, but she did not reprimand either of them or recommend any disciplinary action. It was undisputed that the argument was conducted in a louder tone of voice than an ordinary conversation and the examiner and Board found "it entirely likely that Hampton's and Landon's raised voices during the course of the argument were loud enough to carry it over to at least portions of the coffee shop dining area."

On the following day, Mrs. Cobb reported the occurrence to Mrs. Kirk, who testified that she neither did anything about it nor made any recommendation to her superiors. Nor did she comment on the matter to Vivian Hampton, all on the ground, as she put it, that the girls in the coffee shop are all friends and she considered that they "belonged to her."

Nevertheless, on June 8, Mrs. Kirk was upset and in tears and upon inquiry by Mrs. Hampton as to what was wrong, she said that she had lost all of her friends and that she was embarrassed with Mr. Baker because her department "was the only department in the hotel that had any union members in it and that it put her in a stupid position, like she was not able to control her girls." Thereupon Mrs. Hampton attempted to assure Mrs. Kirk that it was not her fault and that she would be glad herself to explain this to Mr. Baker; whereupon Mrs. Kirk said, "don't worry, you are going to get a chance. He is very disappointed in you anyway." Mrs. Kirk told her not to leave the hotel and in a few minutes, Mr. Baker's secretary phoned and asked Mrs. Hampton to come to his office.[1]

---

1. The testimony on this conversation, which is of considerable significance in that it demonstrates that Mr. Baker was aware of the union activities of the employees in the coffee shop and Mrs. Hampton's part in it, prior to Mr. Baker's learning anything about the Sunday argument, is as follows:

"A: Well, we asked Miss Ida what the trouble was and she told us that she didn't have a friend in the coffee shop and we tried to assure her that we were all her friends. She said, no, we were not, and she asked me directly then why I had tried to organize all of her girls when I was going to quit anyway and I told her I hadn't been trying to organize any of her girls, that I hadn't done anything.

"She said yes, I had, that she had—that I had had an argument with Ralph on the previous Sunday after she had asked me not to talk about it on the floor.

"Q: All right.

"A: And she just—I don't remember exactly how this proceeded along because she was very upset and crying and all of us were trying to talk at one time and then she said, if Mr. Sanderford had been there, it wouldn't have happened. I told her it would have happened, that the same union man would have been at the back door passing out the same literature, that it had nothing to do with the fact that Mr. Sanderford wasn't there any more, I would be glad to tell Mr. Baker the very same thing.

"I said, what has he said to you to get you so upset anyway? She said to me or

to the three of us standing there he had told her—

"MR. CALLAWAY: Just a minute. We object to this statement.

"TRIAL EXAMINER: She is relating a conversation she had with Kirk.

"MR. CALLAWAY: Yes.

"TRIAL EXAMINER: And Kirk is admittedly a supervisory employee, is she not?

"MR. CALLAWAY: Yes.

"TRIAL EXAMINER: Objection overruled.

"Q: (By Mr. Smith) What did she say?

"A: She said Mr. Baker had told her that her department was the only department in the hotel that had any union members in it and that it put her in a stupid position, like she wasn't able to control her girls, and I explained to her that she wasn't taken into our confidence for the simple reason that the union had nothing to do with people in a supervisory capacity, they were only interested in laboring people, that we hadn't gone behind her back to do it and I'd be glad to talk to Mr. Baker in her behalf.

"She said, 'Don't worry, you are going to get a chance. He's very disappointed in you anyway,' or that he wanted to talk to me.

"She told me not to leave the hotel. Well, I was off duty at the time. I had a 3:00 appointment and I told her I did, so she asked me not to leave, that she was going back upstairs and we were to go downstairs and dress and that's what we did and in a few minutes from then, I had partly dressed and the 'phone rang

Thereupon, Mrs. Hampton went to Mr. Baker's office and found him there with Mrs. Kirk and his secretary. She undertook to tell him that, "Miss Ida was very upset and that she had been showing resentment to the girls and I didn't think she should be blamed for anything that might be going on down in the coffee shop." She told him that other than having a discussion with Ralph Landon on Sunday, she had not "talked union" on the floor.

Two days later, on June 10, Mr. Baker sent for Mrs. Hampton to come back to his office, whereupon he handed her a written statement which purported to be a statement of what had occurred on the earlier occasion. That statement started out with the language, "Wednesday, June 8, Miss Ida told me that Vivian wanted to talk to me about a matter and wanted to see me. Prior to that time, I had no knowledge of Vivian wanting to see me about anything and I had not asked to see her." Upon reading this, Vivian objected to the statement implying that she had been the first to think of a discussion between them. Thereupon, Mr. Baker proposed that Vivian re-dictate the statement to conform with what had actually happened on June 8, and the following statement was transcribed by Mr. Baker's secretary. "Wednesday, June 8, Miss Ida and Vivian came to my office and Vivian asked to speak to me on Miss Ida's behalf. Vivian stated to me in substance that she did not want Miss Ida blamed for anything; that Miss Ida instructed her not to be talking about unions to other employees while on duty, but she said she did and broke that promise. Also, she had had a discussion with Ralph, as he was saying some

things about the union which were not correct, and Vivian corrected them, and she said Ralph made her mad." The examiner and the Board found that Mrs. Hampton agreed that this was a correct statement of their June 8th conversation.

Immediately following this discussion in Mr. Baker's office on the 8th, Mr. Baker obtained statements from Ralph, Mrs. Kirk and Mrs. Cobb. He stated that he obtained these statements because he learned from Vivian Hampton's statement that she had been engaged in a "disturbance"[2] on the 5th. After receiving the statements, he then said he determined to discharge Vivian Hampton and instructed Mrs. Kirk to do so on the 13th, causing Mrs. Kirk to write the notice of discharge in her own handwriting, although it was in fact dictated by counsel for the hotel company and furnished by Mr. Baker to Mrs. Kirk. The discharge notice was as follows:

"I am letting you go Vivian, first because you have disobeyed orders about carring [sic] on union business while on duty.

"Second—for creating disturbances while on duty.

"Third—Interfering with other employees in the performance of their work while on duty.

"Fourth—and in general failed to do the job as you are supposed to do it."

Neither at the time of Mrs. Hampton's appearance in his office on the 8th, nor at the time of her reappearance on the 10th, or on any other occasion did Mr. Baker ever extend to her the opportunity of explaining anything about the discus-

---

and Zora Basden answered the 'phone and then she came back to me and told me that Mr. Baker wanted to see me upstairs.

"Q: Did she say who had called?

"A: Said Miss Ida had called and that he wanted to see me and that Zora had asked if he wanted she or Peggy and Miss Ida said no, that Mr. Baker said he wanted to see me because he knew me better, maybe would talk to them later."

2. Although counsel for Respondent, both in cross-examination and in their brief repeatedly characterizes the "discussion" with Ralph Landon as a "disturbance" or as a "ruckus", it is significant that the language used by Mrs. Hampton as the basis of which Baker says he caused the investigation to be made is "she had a *discussion* with Ralph."

sion between her and Ralph. No disciplinary action of any kind was taken against Ralph for his part in the discussion or the "disturbance."

As pointed out in the findings of the examiner, "Although Hampton's union activities while on duty was cited in her discharge notice as the first reason for her discharge, the respondent has now relegated that ground to a position of subordinate importance, if, indeed, it does not abandon it altogether. Baker testified that if all Hampton had done was to solicit employees to join the union, that such solicitation had been done on company time, and if 'there had been no disturbance or anything of that kind,' she would still be working at the hotel. He would not, he said, discharge Hampton simply for soliciting on Company time unless 'she continued it after she had been warned the second time, at least.'"

█ In light of this position taken by the respondent, it becomes necessary for us to determine whether the alleged ground of discharge, that is the argument between Vivian Hampton and Ralph Landon in the kitchen on June 5, was the real ground for the discharge rather than her union activities. The standard which we apply, of course, is whether there is substantial evidence on the record as a whole to support the finding of the Board, which, in accord with that of the examiner, is that the assigned reason for the discharge was a subterfuge and the real reason was Vivian Hampton's union activities. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

We conclude that there was sufficient evidence before the examiner to warrant the inference which he drew that prior to the time when Mr. Baker learned anything at all about the argument in the kitchen, he was aware of Vivian Hampton's activity in making the coffee shop the only department in the hotel in which the union was at all successful in its organizing drive. These circumstances include two significant facts. The first is that by June 1st he had singled out Mrs. Kirk, manager of the coffee shop, of all the department heads in the hotel, to instruct her not to discharge any employees in the coffee shop without first talking the matter over with him. He explained that he had done this because "with all this activity in the coffee shop, we were trying to bend over backwards not to have any infraction of the unfair labor practice," (Emphasis added.) and explained that this was the reason why he had instructed Mrs. Kirk and no other department head in the matter.

The second circumstance is that the occasion of Vivian Hampton's going to see Mr. Baker in the first place was the fact that the coffee shop manager, Mrs. Kirk, was visibly upset during the day of June 8 and when asked the reason for her upset condition she complained that the girls had gone back on her or had abandoned her by joining the union without taking her into their confidence and when Mrs. Hampton said she would explain that Mrs. Kirk was blameless in the matter to Mr. Baker, Mrs. Kirk responded that she would have an opportunity to do so, because Mr. Baker was already "disappointed" in her. A reading of the testimony dealing with this conversation between Mrs. Kirk, as manager of the coffee shop and Vivian Hampton makes it clear that there was ample basis for the board's determination that when Mrs. Hampton went to Mr. Baker's office, he was fully aware of her role as an active worker for the union and that he was "disappointed" with her for that reason.[3]

3. Although counsel for respondent made several efforts to shake Mrs. Hampton's testimony to the effect that Mr. Baker wanted to see her before she suggested to Mrs. Kirk that she would see him, he failed to do so. Faced with this situation which respondent clearly recognized as being of extreme significance, there was no evidence adduced on behalf of the respondents that categorically denied knowledge by Baker of the union activity in the coffee shop and Vivian Hampton's participation in it. (She freely admitted that she was active for the

While there is no absolute burden, of course, on the part of an employer to make a full and fair investigation into the part an employee has played in an argument before it discharges him for cause, we think the examiner clearly was justified in inferring from the manner in which the "investigation" was made by Baker following Vivian Hampton's appearance in his office, that there was no real effort to make any investigation as to what actually happened at the time or in connection with the disturbance. In the first place, if Baker is to be fully credited, when Mrs. Hampton was through making her statement to him on the afternoon of June 8, she had not said a word about a "disturbance" or an "altercation" or an "argument" or even any loud talking. All she had said was that she had violated her agreement (she rejected the word "promise") not to discuss the union on the floor of the coffee shop and that she had a "discussion" with Ralph Landon about the union and that what he said made her mad. Without asking her the nature of the discussion or who started it and without asking any of the other parties who were present at the scene who started the conversation, whose fault it was or to what extent it disturbed the peace and quiet of the coffee shop, Baker decided to fire Vivian Hampton.

In point of fact, although the examiner and the Board accepted the fact that the argument in the kitchen was loud enough to be heard in the coffee shop, there is actually very little evidence to support this finding. We have carefully read the entire record and, aside from the written statement submitted by Mrs. Cobb, which was not in evidence for the proba-

tive value of the facts contained in it, it is almost pure surmise that the argument which appears to have been the basis on which Baker said he caused the investigation to be started was overheard by anybody outside the kitchen. Mrs. Cobb spoke of an entirely different argument at a different time in the day and even she on cross-examination did not pay too much attention to it. She said, "I did not know anything was going—too wrong, I didn't know anything was wrong, as you say wrong, when I heard the commotion in the kitchen. We frequently hear that, sir." Thus, we find that Vivian Hampton, contrary to instructions directed to her alone by the manager of the coffee shop not to discuss the union, got into an argument with Ralph Landon, a cook in the kitchen of the coffee shop who was belittling the union's value to his fellow employees, and in the course of the argument it was heard by the assistant manager, who was then in charge, but not to the extent that she considered it much of anything wrong; she went to the kitchen and told the girls to go back to their places and break off the argument. She reported the following day to her superior, Mrs. Kirk, who did nothing at all about it, either in the nature of discussing it with the participants or in the nature of reporting it to her superior at the hotel; two days later Mrs. Kirk appeared in a highly emotional state and when asked by the waitress herself the cause of her upset condition, she attributed it to the girls having gone behind her back and having joined the union under the apparent leadership of Vivian Hampton and when Vivian Hampton offered to go to the manager and explain that Mrs. Kirk was fault-

union on her own time in addition to the Sunday incident.) There is a categorical denial that *prior to June 8* he did not know of her participation and there is a categorical denial that he did not know of the "argument" or "disturbance" until Vivian Hampton came to his office. There is no categorical statement on his part that he knew nothing of her activities in connection with the union drive prior to her actual appearance in his office on the afternoon of June 8. The sig-

nificance which counsel obviously placed on the knowledge or lack of knowledge of Mrs. Hampton's union activities before her visit to his office warrants the inference that the failure to elicit a categorical answer to this question was due to the fact that Baker could not honestly testify that he had not learned of the fact and had not become "disappointed" with Mrs. Hampton just as Mrs. Kirk said was the case.

less in the matter, the latter replied that she would have a chance to see Mr. Baker, because he was going to see her anyway because he was disappointed with her, since the coffee shop was the only department in the hotel that had gone union. Therefore, Mrs. Hampton was invited to the manager's office in response to her offer to speak up for Mrs. Kirk; when she got there she made her statement to the effect that she had violated her agreement not to talk union and that she had had a discussion with Ralph Landon because she got mad at the things he was saying about the union. Thereafter, without making any effort to determine who started the argument or whether Landon was equally at fault with Mrs. Hampton for violating the same rule or requirement, the management caused Mrs. Kirk to write out in her own handwriting an order prepared by Mr. Baker and his lawyer discharging Vivian Hampton, thus making it appear that the discharge was in the normal event of affairs, since Mrs. Kirk normally had the power to hire and fire the employees in the coffee shop.

Not only does it appear to us that there is substantial evidence on the record considered as a whole to warrant the findings by the examiner and the Board, but it appears to us that the findings by the examiner and the Board are more likely than not to be in accord with the facts. We think it appropriate to make this comment, because the respondent here severely criticizes the examiner as being biased in his fact finding. A careful reading of this record indicates that far from being biased, the examiner was careful in his rulings on the reception of evidence, and made findings on disputed items favoring respondent as well as the Board. Moreover, the ultimate finding as to the real basis of the discharge, we think, is more than amply supported by the evidence when full play is given to the right of the examiner and the Board to make reasonable inferences from the practically undisputed testimony touching on the actions of Vivian Hampton in connection with the union, the suc-cess the union was having in the coffee shop and the fact that the management was aware of these facts prior to any report having been made of the "discussion" in the coffee shop which the management treated as of slight importance, except insofar as it furnished an ostensible basis for discharging Mrs. Hampton.

Upon this record, which we have read carefully, there can really be no serious doubt that the findings by the examiner and the Board are supported by substantial evidence. The order of the Board will, therefore, be enforced.