## MARYLAND ET AL. *v.* WIRTZ, SECRETARY OF LABOR, ET AL.

No. 742.   Argued April 23, 1968.—Decided June 10, 1968.

*Alan M. Wilner,* Assistant Attorney General of Maryland, and *Charles Alan Wright* argued the cause for appellants. With *Mr. Wilner* on the brief for appellant the State of Maryland et al. were the Attorneys General for their respective States as follows: *Francis B. Burch* of Maryland, *Crawford C. Martin* of Texas, *MacDonald Gallion* of Alabama, *Darrell F. Smith* of Arizona, *Joe Purcell* of Arkansas, *Duke W. Dunbar* of Colorado, *David Buckson* of Delaware, *Earl Faircloth* of Florida, *Bert T. Kobayashi* of Hawaii, *William G. Clark* of Illinois, *Richard C. Turner* of Iowa, *Robert C. Londerholm*

of Kansas, *James S. Erwin* of Maine, *Elliot L. Richardson* of Massachusetts, *Joe T. Patterson* of Mississippi, *Norman H. Anderson* of Missouri, *Clarence A. H. Meyer* of Nebraska, *Arthur J. Sills* of New Jersey, *Boston E. Witt* of New Mexico, *T. Wade Bruton* of North Carolina, *Helgi Johanneson* of North Dakota, *William B. Saxbe* of Ohio, *G. T. Blankenship* of Oklahoma, *Daniel R. McLeod* of South Carolina, *Frank L. Farrar* of South Dakota, *James L. Oakes* of Vermont, *Robert Y. Button* of Virginia, and *James E. Barrett* of Wyoming; and *A. J. Carubbi, Jr.,* Executive Assistant Attorney General of Texas, *Hawthorne Phillips,* Assistant Attorney General of Texas, and *James V. Noble,* Assistant Attorney General of New Mexico. With *Mr. Wright* on the brief for appellant the State of Texas were *Messrs. Martin, Carubbi,* and *Phillips,* and *Nola White,* First Assistant Attorney General. *Cecil A. Morgan* filed a brief for appellant Fort Worth Independent School District.

*Solicitor General Griswold* argued the cause for appellees. With him on the brief were *Assistant Attorney General Weisl, Louis F. Claiborne, John S. Martin, Jr.,* and *Morton Hollander.*

Briefs of *amici curiae,* urging affirmance, were filed by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations, and by *Henry Kaiser* and *Ronald Rosenberg* for the American Federation of State, County, and Municipal Employees, AFL–CIO.

Mr. Justice Harlan delivered the opinion of the Court.

As originally enacted,[1] the Fair Labor Standards Act of 1938 required every employer to pay each of his employees "engaged in commerce or in the production

---

[1] 52 Stat. 1060.

of goods for commerce"[2] a certain minimum hourly wage, and to pay at a higher rate for work in excess of a certain maximum number of hours per week. The Act defined the term "employer" so as to exclude "the United States or any State or political subdivision of a State . . . ."[3] This case involves the constitutionality of two sets of amendments to the original enactment.

In 1961, Congress changed the basis of employee coverage: instead of extending protection to employees individually connected to interstate commerce, the Act now covers all employees of any "enterprise" engaged in commerce or production for commerce, provided the enterprise also falls within certain listed categories.[4] In 1966, Congress added to the list of categories the following:

"(4) is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution, a school for the mentally or physically handicapped or gifted children, an elementary or secondary school, or an insti-

---

[2] §§ 6 (a), 7 (a), 52 Stat. 1062, 1063.

[3] § 3 (d), 52 Stat. 1060.

[4] The minimum wage requirement, 29 U. S. C. § 206 (1964 ed., Supp. II), now reads as follows: "(a) Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates . . . ." The maximum hours requirement, 29 U. S. C. § 207 (1964 ed., Supp. II), now contains a similar definition of covered employees. The term "enterprise engaged in commerce or in the production of goods for commerce" is defined by 29 U. S. C. § 203 (s) (1964 ed., Supp. II) to mean "an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which—[falls in any one of four listed categories] . . . ."

tution of higher education (regardless of whether or not such hospital, institution, or school is public or private or operated for profit or not for profit)." [5]

At the same time, Congress modified the definition of "employer" so as to remove the exemption of the States and their political subdivisions with respect to employees of hospitals, institutions, and schools.[6]

The State of Maryland, since joined by 27 other States and one school district, brought this action against the Secretary of Labor to enjoin enforcement of the Act insofar as it now applies to schools and hospitals operated by the States or their subdivisions. The plaintiffs made four contentions. They argued that the expansion of coverage through the "enterprise concept" was beyond the power of Congress under the Commerce Clause. They contended that coverage of state-operated hospitals and schools was also beyond the commerce power. They asserted that the remedial provisions of the Act,[7] if applied to the States, would conflict with the Eleventh Amendment. Finally, they urged that even if their constitutional arguments were rejected, the court should declare that schools and hospitals, as enterprises, do not have the statutorily required relationship to interstate commerce.

A three-judge district court, convened pursuant to 28 U. S. C. § 2282, declined to issue a declaratory judgment or an injunction.[8] Three opinions were written. Judges Winter and Thomsen, constituting the majority, concluded for different reasons that the adoption of the "enterprise concept" of coverage and the extension of coverage to state institutions could not be said, on the

---

[5] 80 Stat. 832, 29 U. S. C. § 203 (s) (4) (1964 ed., Supp. II).

[6] 80 Stat. 831, 29 U. S. C. § 203 (d) (1964 ed., Supp. II).

[7] 29 U. S. C. §§ 216 (b), 216 (c), 217.

[8] 269 F. Supp. 826.

face of the Act, to exceed Congress' power under the Commerce Clause. Both declined to consider the Eleventh Amendment and statutory contentions. Judge Northrop dissented, concluding that the amendments exceeded the commerce power because they transgressed the sovereignty of the States.

We noted probable jurisdiction of the plaintiffs' appeal, 389 U. S. 1031. For reasons to follow, we affirm the judgment of the District Court.

## I.

We turn first to the adoption in 1961 of the "enterprise concept." Whereas the Act originally extended to every employee "who is engaged in commerce or in the production of goods for commerce," it now protects every employee who "is employed in an enterprise engaged in commerce or in the production of goods for commerce." [9] Such an enterprise is defined as one which, along with other qualifications, "has employees engaged in commerce or in the production of goods for commerce . . . ." [10] Thus the effect of the 1961 change was to extend protection to the fellow employees of any employee who would have been protected by the original Act, but not to enlarge the class of *employers* subject to the Act.

In *United States* v. *Darby,* 312 U. S. 100, this Court found the original Act a legitimate exercise of congressional power to regulate commerce among the States. Appellants accept the *Darby* decision, but contend that the extension of protection to fellow employees of those originally covered exceeds the commerce power. We conclude, to the contrary, that the constitutionality of the "enterprise concept" is settled by the reasoning of *Darby* itself and is independently established by principles stated in other cases.

---

[9] 29 U. S. C. §§ 206 (a), 207 (a) (1964 ed., Supp. II).

[10] 29 U. S. C. § 203 (s) (1964 ed., Supp. II).

*Darby* involved employees who were engaged in producing goods for commerce. Their employer contended that since manufacturing is itself an intrastate activity, Congress had no power to regulate the wages and hours of manufacturing employees. The first step in the Court's answer was clear: "[Congress may] by appropriate legislation regulate intrastate activities where they have a substantial effect on interstate commerce." [11]

The next step was to discover whether such a "substantial effect" existed. Congress had found that substandard wages and excessive hours, when imposed on employees of a company shipping goods into other States, gave the exporting company an advantage over companies in the importing States. Having so found, Congress decided as a matter of policy that such an advantage in interstate competition was an "unfair" one, and one that had the additional undesirable effect of driving down labor conditions in the importing States. [12] This Court was of course concerned only with the finding of a substantial effect on interstate competition, and not with

---

[11] 312 U. S., at 119. The Act prohibited both the interstate transportation of goods produced under substandard labor conditions, and the maintenance of such conditions themselves. The first prohibition, a restraint on commerce itself, was upheld against the contention that its real motive or purpose was to regulate manufacturing. The language quoted in the text answered a challenge to the second prohibition.

[12] Section 2 of the Act, 52 Stat. 1060, 29 U. S. C. § 202, reads in part as follows:

"The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce . . . ."

the consequent policy decisions. In accepting the congressional finding, the Court followed principles of judicial review only recently rearticulated in *Katzenbach* v. *McClung*, 379 U. S. 294, 303–304:

> "Of course, the mere fact that Congress has said when particular activity shall be deemed to affect commerce does not preclude further examination by this Court. But where we find that the legislators . . . have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end." [13]

There was obviously a "rational basis" for the logical inference that the pay and hours of production employees affect a company's competitive position.

The logical inference does not stop with production employees. When a company does an interstate business, its competition with companies elsewhere is affected by all its significant labor costs, not merely by the wages and hours of those employees who have physical contact with the goods in question. Consequently, it is not surprising that this Court has already explicitly recognized that Congress' original choice to extend the Act only to certain employees of interstate enterprises was not constitutionally compelled; rather, Congress decided, at that time, "not to enter areas which it might have occupied

---

[13] In *Katzenbach* v. *McClung*, it appeared that Congress had undertaken extensive investigation of the commercial need for the statute there involved. A major contention of the appellants in the present case is that the legislative history of the amendments now before us lays no factual predicate for extensions of the original Act. To the extent that this is true, it is quite irrelevant. The original Act stated Congress' findings and purposes as of 1938. Subsequent extensions of coverage were presumably based on similar findings and purposes with respect to the areas newly covered. We are not concerned with the manner in which Congress reached its factual conclusions.

[under the commerce power]." *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 522.

The "enterprise concept" is also supported by a wholly different line of analysis. In the original Act, Congress stated its finding that substandard labor conditions tended to lead to labor disputes and strikes, and that when such strife disrupted businesses involved in interstate commerce, the flow of goods in commerce was itself affected.[14] Congress therefore chose to promote labor peace by regulation of subject matter, wages, and hours, out of which disputes frequently arise. This objective is particularly relevant where, as here,[15] the enterprises in question are significant importers of goods from other States.

Although the Court did not examine this second objective in *Darby,* other cases have found a "rational basis" for statutes regulating labor conditions in order to protect interstate commerce from labor strife. The National Labor Relations Act [16] had been passed because

> "[t]he denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce . . . ." [17]

In *Labor Board* v. *Jones & Laughlin,* 301 U. S. 1, this Court held that the National Labor Relations Act (NLRA) was within the commerce power. The essence of the decision was contained in two propositions: "the stoppage of those [respondent's] operations by industrial

---

[14] Section 2, 29 U. S. C. § 202, declares in part that the existence of substandard labor conditions "leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce."

[15] See *infra,* at 194–195.

[16] 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.*

[17] § 1, 49 Stat. 449.

strife would have a most serious effect upon interstate commerce," *id.*, at 41; and "[e]xperience has abundantly demonstrated that the recognition of the right of employees to self-organization and to have representatives of their own choosing for the purpose of collective bargaining is often an essential condition of industrial peace." *Id.*, at 42.

The Fair Labor Standards Act, including the present "enterprise" definition of coverage, may also be supported by two propositions. One is identical with the first proposition supporting the NLRA: strife disrupting an enterprise involved in commerce may disrupt commerce. The other is parallel to the second proposition supporting the NLRA: there is a basis in logic and experience for the conclusion that substandard labor conditions among any group of employees, whether or not they are personally engaged in commerce or production, may lead to strife disrupting an entire enterprise.

Whether the "enterprise concept" is defended on the "competition" theory or on the "labor dispute" theory, it is true that labor conditions in businesses having only a few employees engaged in commerce or production may not affect commerce very much or very often. Appellants therefore contend that defining covered enterprises in terms of their employees is sometimes to permit "the tail to wag the dog." However, while Congress has in some instances left to the courts or to administrative agencies the task of determining whether commerce is affected in a particular instance, *Darby* itself recognized the power of Congress instead to declare that an entire class of activities affects commerce.[18] The only question for the courts is then whether the class is "within the reach of the federal power." [19] The contention that in

---

[18] 312 U. S., at 120–121.

[19] *Ibid.*

Commerce Clause cases the courts have power to excise, as trivial, individual instances falling within a rationally defined class of activities has been put entirely to rest. *Wickard* v. *Filburn,* 317 U. S. 111, 127–128; *Polish Alliance* v. *Labor Board,* 322 U. S. 643, 648; *Katzenbach* v. *McClung, supra,* at 301. The class of employers subject to the Act was not enlarged by the addition of the enterprise concept. The definition of that class is as rational now as it was when *Darby* was decided.

## II.

Appellants' second contention is that the commerce power does not afford a constitutional basis for extension of the Act to schools and hospitals operated by the States or their subdivisions. Since the argument is made in terms of interference with "sovereign state functions," it is important to note exactly what the Act does. Although it applies to "employees," the Act specifically exempts any "employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools) . . . ." [20] We assume, as did the District Court,[21] that medical personnel are likewise excluded from coverage under the general language. The Act establishes only a minimum wage and a maximum limit of hours unless overtime wages are paid, and does not otherwise affect the way in which school and hospital duties are performed. Thus appellants' characterization of the question in this case as whether Congress may, under the guise of the commerce power, tell the States how to perform medical and educational functions is not factually accurate. Congress has "interfered with" these

[20] 29 U. S. C. § 213 (1) (1964 ed., Supp. II).
[21] See 269 F. Supp., at 832 (opinion of Judge Winter).

state functions only to the extent of providing that when a State employs people in performing such functions it is subject to the same restrictions as a wide range of other employers whose activities affect commerce, including privately operated schools and hospitals.[22]

It is clear that labor conditions in schools and hospitals can affect commerce. The facts stipulated in this case indicate that such institutions are major users of goods imported from other States. For example:

> "In the current fiscal year an estimated $38.3 billion will be spent by State and local public educational institutions in the United States. In the fiscal year 1965, these same authorities spent $3.9 billion operating public hospitals. . . .

> "For Maryland, which was stipulated to be typical of the plaintiff States, 87% of the $8 million spent for supplies and equipment by its public school system during the fiscal year 1965 represented direct interstate purchases. Over 55% of the $576,000 spent for drugs, x-ray supplies and equipment and hospital beds by the University of Maryland Hospital and seven other state hospitals were out-of-state purchases."[23]

---

[22] In the court below, Judge Thomsen was troubled by the application of the overtime provisions to school and hospital personnel, who may have different arrangements for hours of work than employees of other enterprises. 269 F. Supp., at 851. Congress indicated its attention to this problem in 29 U. S. C. § 207 (1964 ed., Supp. II), which provides special means of computing hospital overtime. That this provision may seem to some inadequate, and that no similar provision was made in the case of schools, are matters outside judicial cognizance. The Act's overtime provisions apply to a wide range of enterprises, with differing patterns of worktime; they were intended to change some of those patterns. It is not for the courts to decide that such changes as may be required are beneficial in the case of some industries and harmful in others.

[23] 269 F. Supp., at 833 (opinion of Judge Winter).

Similar figures were supplied for other States.[24]   Strikes and work stoppages involving employees of schools and hospitals, events which unfortunately are not infrequent,[25] obviously interrupt and burden this flow of goods across state lines.   It is therefore clear that a "rational basis" exists for congressional action prescribing minimum labor standards for schools and hospitals, as for other importing enterprises.[26]

Indeed, appellants do not contend that labor conditions in all schools and hospitals are without the reach of the commerce power, but only that the Act may not be constitutionally applied to state-operated institutions because that power must yield to state sovereignty in the performance of governmental functions. This argument simply is not tenable.   There is no general

> "doctrine implied in the Federal Constitution that 'the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other.'" *Case* v. *Bowles,* 327 U. S. 92, 101.

In the first place, it is clear that the Federal Government, when acting within a delegated power, may override countervailing state interests whether these be described as "governmental" or "proprietary" in character.   As long ago as *Sanitary District* v. *United States,* 266 U. S. 405, the Court put to rest the contention that state concerns might constitutionally "outweigh" the importance of an otherwise valid federal statute regulating

---

[24] See *ibid.*

[25] See U. S. Department of Labor, Summary Release, Work Stoppages Involving Government Employees, 1966.

[26] Both under the present Act and the National Labor Relations Act, numerous cases have held that the engagement of an enterprise in interstate commerce may consist of importation.   *E. g., Wirtz* v. *Hardin & Co.,* 253 F. Supp. 579, aff'd, 359 F. 2d 792 (FLSA); *N. L. R. B.* v. *Baker Hotel,* 311 F. 2d 528 (NLRA).

commerce. Congress had imposed statutory limits on the diversion of water from Lake Michigan. A unanimous Court, speaking through Mr. Justice Holmes, declared that the sanitary district's alleged need for more water than federal law allowed was "irrelevant" because federal power over commerce is "superior to that of the States to provide for the welfare or necessities of their inhabitants." *Id.,* at 426. See *Oklahoma* v. *Atkinson Co.,* 313 U. S. 508.

There remains, of course, the question whether any particular statute is an "otherwise valid regulation of commerce." This Court has always recognized that the power to regulate commerce, though broad indeed, has limits. Mr. Chief Justice Marshall paused to recognize those limits in the course of the opinion that first staked out the vast expanse of federal authority over the economic life of the new Nation. *Gibbons* v. *Ogden,* 9 Wheat. 1, 194–195. Mr. Chief Justice Hughes, speaking only one Term after he delivered the opinion for the Court in *Jones & Laughlin, supra,* put the matter thus:

> "The subject of federal power is still 'commerce,' and not all commerce but commerce with foreign nations and among the several States. The expansion of enterprise has vastly increased the interests of interstate commerce but the constitutional differentiation still obtains." *Santa Cruz Co.* v. *Labor Board,* 303 U. S. 453, 466.

The Court has ample power to prevent what the appellants purport to fear, "the utter destruction of the State as a sovereign political entity." [27]

But while the commerce power has limits, valid general regulations of commerce do not cease to be regula-

---

[27] The dissent suggests that by use of an "enterprise concept" such as that we have upheld here, Congress could under today's decision declare a whole State an "enterprise" affecting commerce and take over its budgeting activities. This reflects, we think, a

tions of commerce because a State is involved. If a State is engaging in economic activities that are validly regulated by the Federal Government when engaged in by private persons, the State too may be forced to conform its activities to federal regulation. This was settled by the unanimous decision in *United States* v. *California,* 297 U. S. 175. The question was whether a railroad, operated by the State, and entirely within the State, as a nonprofit venture for the purpose of facilitating transportation at a port, was nevertheless subject, like other railroads, to the Safety Appliance Act. The Court first held that although the railroad operated only between points in California, it was within the reach of federal regulation of interstate rail transportation. 297 U. S., at 181–183. The Court then proceeded to consider the claim that the State "is not subject to the federal Safety Appliance Act," and reasoned as follows:

> "[W]e think it unimportant to say whether the state conducts its railroad in its 'sovereign' or in its

---

misreading of the Act, of *Wickard* v. *Filburn, supra,* and of our decision. The Act's definition of "enterprise" reads in part as follows:

" 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose . . . but shall not include the related activities performed for such enterprise by an independent contractor . . . ." 29 U. S. C. § 203(r).

We uphold the enterprise concept on the explicit premise that an "enterprise" is a set of operations whose activities in commerce would all be expected to be affected by the wages and hours of any group of employees, which is what Congress obviously intended. So defined, the term is quite cognizant of limitations on the commerce power. Neither here nor in *Wickard* has the Court declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities. The Court has said only that where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.

'private' capacity. That in operating its railroad it is acting within a power reserved to the states cannot be doubted. The only question we need consider is whether the exercise of that power, in whatever capacity, must be in subordination to the power to regulate interstate commerce, which has been granted specifically to the national government. The sovereign power of the states is necessarily diminished to the extent of the grants of power to the federal government in the Constitution.

.     .     .     .     .

"[W]e look to the activities in which the states have traditionally engaged as marking the boundary of the restriction upon the federal taxing power. But there is no such limitation upon the plenary power to regulate commerce. The state can no more deny the power if its exercise has been authorized by Congress than can an individual." 297 U. S., at 183–185 (citations omitted).

See also *Board of Trustees* v. *United States,* 289 U. S. 48, where the Court rejected a claim of "state sovereignty" and held that a state university that imported scientific apparatus from abroad could be made to pay import duties imposed pursuant to the power over foreign commerce.

The principle of *United States* v. *California* is controlling here. Appellants' argument that the statute involved there was somewhat more directly and obviously a regulation of "commerce," and that the state activity involved there was less central to state sovereignty, misses the mark. This Court has examined and will continue to examine federal statutes to determine whether there is a rational basis for regarding them as regulations of commerce among the States. But it will not carve up the commerce power to protect enterprises

indistinguishable in their effect on commerce from private businesses, simply because those enterprises happen to be run by the States for the benefit of their citizens.[28]

## III.

Appellants raise two further issues, both of which the District Court found it inappropriate to explore fully in a declaratory judgment proceeding. We agree. In each case we conclude that no showing has been made that warrants declaratory or injunctive relief. In neither instance, however, do we mean to preclude future consideration on the facts of individual cases.

The first question is whether the Act violates the States' sovereign immunity from suit guaranteed by the Eleventh Amendment.[29] The Act provides as follows:

"Any employer who violates the provisions of section 206 [wages] or section 207 [hours] of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction . . . ." 29 U. S. C. § 216 (b).

The Act also provides for suits by the Secretary of Labor to recover unpaid minimum wages or overtime compen-

---

[28] Nor is it relevant that Congress originally chose to exempt all state enterprises and later partially removed that exemption. Congress was as free to include state activities within the general regulation at a later date as it would have been to omit the exemption in the first place.

[29] "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

sation, 29 U. S. C. § 216 (c) and for injunctive relief against violations, 29 U. S. C. § 217.

Percolating through each of these provisions for relief are interests of the United States and problems of immunity, agency, and consent to suit. Cf. *Parden* v. *Terminal R. Co.*, 377 U. S. 184. The constitutionality of applying the substantive requirements of the Act to the States is not, in our view, affected by the possibility that one or more of the remedies the Act provides might not be available when a State is the employer-defendant. Particularly in light of the Act's "separability" provision, 29 U. S. C. § 219, we see no reason to strike down otherwise valid portions of the Act simply because other portions might not be constitutional as applied to hypothetical future cases. At the same time, we decline to be drawn into an abstract discussion of the numerous complex issues that might arise in connection with the Act's various remedial provisions. They are almost impossible and most unnecessary to resolve in advance of particular facts, stated claims, and identified plaintiffs and defendants. Questions of state immunity are therefore reserved for appropriate future cases.

Appellants' remaining contention presents similar problems. In order to be covered by the Act, an employer hospital or school must in fact have

"employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person . . . ." 29 U. S. C. § 203 (s) (1964 ed., Supp. II).

Appellants ask us to declare that hospitals and schools simply have no such employees. The word "goods" is elsewhere defined to exclude "goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or

processor thereof." 29 U. S. C. § 203 (i). Appellants contend that hospitals and schools are the ultimate consumers of the out-of-state products they buy, and hence none of their employees handles "goods" in the statutory sense.

We think the District Court was correct in declining to decide, in the abstract and in general, whether schools and hospitals have employees engaged in commerce or production. Such institutions, as a whole, obviously purchase a vast range of out-of-state commodities. These are put to a wide variety of uses, presumably ranging from physical incorporation of building materials into hospital and school structures, to over-the-counter sale for cash to patients, visitors, students, and teachers. Whether particular institutions have employees handling goods in commerce, cf. *Walling* v. *Jacksonville Paper Co.*, 317 U. S. 564, may be considered as occasion requires.

The judgment of the District Court is

*Affirmed.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE STEWART concurs, dissenting.

The Court's opinion skillfully brings employees of state-owned enterprises within the reach of the Commerce Clause; and as an exercise in semantics it is unexceptionable if congressional federalism is the standard. But what is done here is nonetheless such a serious invasion of state sovereignty protected by the Tenth Amendment that it is in my view not consistent with our constitutional federalism.

The case has some of the echoes of *New York* v. *United States*, 326 U. S. 572, where a divided Court held that

the Federal Government could tax the sale of mineral waters owned and marketed by New York. My dissent was in essence that the decision made the States pay the Federal Government "for the privilege of exercising the powers of sovereignty guaranteed them by the Constitution." 326 U. S., at 596.

The present federal law takes a much more serious bite. The 1966 amendments to the Fair Labor Standards Act require the States to pay school and hospital employees a minimum wage escalating to $1.60 per hour in 1971.[1] As a general rule, the amendments make the States pay their employees who work over 40 hours a week overtime compensation of $1\frac{1}{2}$ times their regular wage.[2] There are civil sanctions against the State and its political subdivisions,[3] and state officials may, apparently, be subjected to criminal penalties.[4] The impact is pervasive, striking at all levels of state government. As Judge Northrop said in his dissent below, 269 F. Supp. 826, 853:

> "By this Act Congress is forcing, under threat of civil liability and criminal penalties, the state legislature or the responsible political subdivision of the state
>
> "1. to increase taxes (an impossibility in some of the political subdivisions without a state constitutional amendment); or
>
> "2. to curtail the extent and calibre of services in the public hospitals and educational and related institutions of the state; or

---

[1] 29 U. S. C. §§ 203 (d), 206 (b) (1964 ed., Supp. II).

[2] 29 U. S. C. § 207 (b) (1964 ed., Supp. II). Special rules are applicable to hospitals under § 207 (j) based on an 80-hour, 14-day work period. No special rules apply to school employees. See discussion of the overtime pay provisions by Chief Judge Thomsen, 269 F. Supp., at 851–852.

[3] 29 U. S. C. §§ 203 (d), 216 (b).

[4] 29 U. S. C. §§ 203 (a), 215, 216 (a).

"3. to reduce indispensable services in other governmental activities to meet the budgets of those activities favored by the United States Congress; or

"4. to refrain from entering new fields of governmental activity necessitated by changing social conditions."

There can be no doubt but that the 1966 amendments to the Fair Labor Standards Act disrupt the fiscal policy of the States and threaten their autonomy in the regulation of health and education. Yet, the Court considers it irrelevant that these federal regulations are to be enforced against sovereign States and limits its consideration to "whether there is a rational basis for regarding them as regulations of commerce among the States."

The States are not totally immune from federal regulation under the commerce power of Congress. *Parden* v. *Terminal R. Co.*, 377 U. S. 184, and *United States* v. *California*, 297 U. S. 175, subjected state-owned railroads to the Federal Employers' Liability Act, 45 U. S. C. § 51 *et seq.*, and the Safety Appliance Act, 45 U. S. C. § 1 *et seq.*; *Board of Trustees* v. *United States*, 289 U. S. 48, required a state university to pay federal customs duties on educational equipment it imported. In *Oklahoma* v. *Atkinson Co.*, 313 U. S. 508, the Federal Government was permitted to condemn 100,000 acres of state land for a reservoir to control commerce-paralyzing floods. In *Sanitary District* v. *United States*, 266 U. S. 405, a State was prohibited from diverting water from the Great Lakes necessary to ensure navigability, a phase of commerce.

In none of these cases, however, did the federal regulation overwhelm state fiscal policy. It is one thing to force a State to purchase safety equipment for its railroad and another to force it either to spend several million more dollars on hospitals and schools or substantially reduce services in these areas. The commerce

power cases the Court relies on are simply not apropos.

In the area of taxation, on the other hand, the Court has recognized that the constitutional scheme of federalism imposes limits on the power of the National Government to tax the States. *E. g., New York* v. *United States,* 326 U. S. 572. The Court will not permit the Federal Government to utilize the taxing power to snuff out state sovereignty, *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, recognizing that the power to tax is the power to destroy. *M'Culloch* v. *Maryland,* 4 Wheat. 316, 431. The exercise of the commerce power may also destroy state sovereignty. All activities affecting commerce, even in the minutest degree, *Wickard* v. *Filburn,* 317 U. S. 111, may be regulated and controlled by Congress. Commercial activity of every stripe may in some way interfere "with the [interstate] flow of merchandise" or interstate travel. *Katzenbach* v. *McClung,* 379 U. S. 294, 299–300. The immense scope of this constitutional power is demonstrated by the Court's approval in this case of regulation on the basis of the "enterprise concept"—which is entirely proper when the regulated "businesses" are not essential functions being carried on by the States.

Yet state government itself is an "enterprise" with a very substantial effect on interstate commerce, for the States spend billions of dollars each year on programs that purchase goods from interstate commerce, hire employees whose labor strife could disrupt interstate commerce, and act on such commerce in countless subtle ways. If constitutional principles of federalism raise no limits to the commerce power where regulation of state activities are concerned, could Congress compel the States to build superhighways crisscrossing their territory in order to accommodate interstate vehicles, to provide inns and eating places for interstate travelers, to quadruple their police forces in order to prevent

commerce-crippling riots, etc.? Could the Congress virtually draw up each State's budget to avoid "disruptive effect[s] . . . on commercial intercourse."? *Atlanta Motel* v. *United States,* 379 U. S. 241, 257.

If all this can be done, then the National Government could devour the essentials of state sovereignty, though that sovereignty is attested by the Tenth Amendment. The principles which should guide us in this case are set forth in the several opinions in *New York* v. *United States, supra.* As Mr. Chief Justice Stone said there, the National Government may not "interfere unduly with the State's performance of its sovereign functions of government." 326 U. S., at 587. It may not "impair the State's functions of government," *id.,* at 594 (dissenting opinion of MR. JUSTICE DOUGLAS, joined by MR. JUSTICE BLACK). As Mr. Justice Frankfurter observed, "[t]here are, of course, State activities . . . that partake of uniqueness from the point of view of intergovernmental relations." *Id.,* at 582.

Whether, in a given case, a particular commerce power regulation by Congress of state activity is permissible depends on the facts. The Court must draw the "constitutional line between the State as government and the State as trader . . . ." *New York* v. *United States, supra,* at 579 (opinion of Mr. Justice Frankfurter). In this case the State as a sovereign power is being seriously tampered with, potentially crippled.

I would reverse the judgment below.