Anthony BRYSON, et al.

v.

CITY OF DeRIDDER, et al.

Civ. A. No. 84–1717.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

June 2, 1987.

---

**246**

Randall G. Wells, Baton Rouge, La., Tony C. Tillman, Tillman & Fontenot, Leesville, La., for plaintiffs.

James K. Nichols and William C. Pegues, III, Dist. Atty., DeRidder, La., for defendants.

## OPINION

VERON, District Judge.

This matter came for trial on December 1, 1986 with jurisdiction being invoked pursuant to 29 U.S.C. § 216(b) of the Fair Labor Standards Act of 1938. Plaintiffs Anthony Bryson, Bennie Lewis, Donnie Lewis, Roger L. Pickle, John Satcher, Jr. and George Lankford aver that defendants, City of DeRidder and Parish of Beauregard, as joint operators of the City–Parish Ambulance Service, violated 29 U.S.C. §§ 207(a)(1) and/or (2) by failing to pay plaintiffs overtime wages as prescribed by FLSA. A federal question is presented and this Court has jurisdiction. This trial has been bifurcated and this opinion covers only the question of liability. The issue of damages has been reserved for trial at a later date.

## FINDINGS OF FACT

The testimony, evidence and admissions presented at trial reveal the following facts that are essential to the resolution of this case:

The City of DeRidder is a City within the State of Louisiana and is a political subdivision of the State. The Parish of Beauregard is a Parish within the State of Louisiana and is also a political subdivision of the State.

Prior to 1971, ambulance services were provided by funeral homes in the City of DeRidder and Beauregard Parish. Even before that, ambulance services were provided by the police, firemen and even private citizens who took those in need of emergency medical care to local hospitals. In 1971, the last of the funeral homes which still provided ambulance service terminated that service.

The availability of an ambulance service was an absolute necessity for city and parish inhabitants. In 1971, as an immediate response to the termination of ambulance service by funeral homes, the City, in conjunction with the Parish, began to provide ambulance service within the City and Parish. The City–Parish Ambulance Service, as it became known, was a function of the City and the Parish from 1971 to June 22, 1985.

The City, through its city council, and the Parish, through its police jury, passed ordinances and resolutions concerning the operation of the City–Parish Ambulance Service. The City and the Parish contributed or were to contribute equal amounts of money each year toward the operation of the ambulance service. While the City administered the daily operations of the City–Parish Ambulance Service, it did so directly or at least indirectly in the interest of the Parish in relation to the employment of the plaintiffs. The ambulance service was the only sustained joint activity of the City and the Parish, at any time prior to, during or after the ambulance service was in operation.

Each plaintiff in this case worked for the City–Parish ambulance service for some, if not all of the time, from June 1981 to June 22, 1985. The work performed by the plaintiffs when they were employees of the ambulance service simultaneously benefited both the City and the Parish. And, while the plaintiffs were employed with the ambulance service, each of them worked in excess of 40 hours in a seven day work week for some, if not all of the work weeks, from June 1981 to June 22, 1985

and was not paid compensation for each hour worked in excess of 40 hours in a work week at a rate of not less than one-and-one-half times the regular rate at which he was employed.

The contributions respectively made by the Parish and City in each year did not constitute the entire budget for each respective budget year for the City–Parish Ambulance Service operated. The ambulance service was funded in part through membership subscriptions. A membership subscription allowed a resident of the City and/or Parish to pay a fee ($50.00 per year) and utilize up to $600.00 worth of ambulance services. Once the $600.00 of service was used, the person utilizing the ambulance service would pay according to a service fee schedule. A City or Parish resident who elected not to become a subscribing member to the ambulance service could none the less use the ambulance service. The non-member, however, would have to pay at least the $50.00 fee plus a per-mile charge to use the ambulance service. The ambulance service was also funded out of the City and Parish's general funds which were in part made up of federal revenue sharing funds. No taxes were ever dedicated to the ambulance service.

The City/Parish governments did not begin operation of the ambulance service until after they had unsuccessfully attempted to lure private ambulance companies from other regions of the state into providing service to the City of DeRidder and Beauregard Parish and were unsuccessful. The City–Parish Ambulance Service proved to be a costly economic burden on both the City and Parish, and in the early 1980's, the City/Parish began to search for an alternative means of providing ambulance services. They once again attempted to convince private ambulance companies to provide ambulance services within the City and Parish. They were however unsuccessful. They also attempted to place the ambulance service under the control and operation of a local hospital, but this attempt also met with failure. Finally, in 1985, the City/Parish governments were able to convince Metropolitan Emergency Services, Inc., a private ambulance service company, to begin operations in the City of DeRidder and Parish of Beauregard. As part of the bargain struck between the City/Parish and the private ambulance company, the City donated the ambulances and equipment to the private company. Having made certain that a continuous and adequate ambulance service would be available to their citizens, the City/Parish governments discontinued the City–Parish Ambulance Service on June 22, 1985.

## CONCLUSIONS OF LAW

Congress amended the FLSA in 1974 to include the states and their political subdivisions within its scope. 29 U.S.C. § 203(d), (s)(6), and (x). In *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the United States Supreme Court held that the Tenth Amendment to the United States Constitution prevented Congress from interfering with the employment practices of states and their political subdivisions in certain governmental activities. In particular, the Supreme Court held that the minimum wage and overtime provisions of the FLSA were not applicable to the states and their subdivisions if the provisions would "impermissibly interfere with the integral governmental functions." *Id.* at 851, 96 S.Ct. at 2474. The Supreme Court, however, overruled *National League of Cities*, on February 19, 1985, in the case of *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), finding that there was nothing in the minimum wage and overtime provisions of the FLSA that was destructive of state sovereignty or violative of any constitutional provision.

This court, in the instant matter, has already held that *Garcia* does not apply retroactively, but only from the date of the decision forward, and that therefore, defendants are subject to the minimum wage and overtime provisions of the FLSA after February 19, 1985. The *National League of Cities* standard is still to be applied for the period prior to February 19, 1985. The question then left for our determination is whether or not the ambulance service pro-

vided by the City/Parish governments was a traditional/integral government function.

After *National League of Cities*, the Supreme Court set forth, in *Hodel v. Virginia Surface Mining and Reclamation Association*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), four conditions that must be satisfied before a government activity may be deemed immune from a particular federal regulation under the Commerce Clause. First, it is said that the federal statute at issue must regulate "the states as states." Second, the statute must "address matters that are indisputable attributes of state sovereignty." Third, state compliance with the federal obligation "must directly impair the state's ability to structure integral operations in areas of traditional governmental functions." And finally, the relation of state and federal interests must not be such that "the nature of the federal interest justifies state submission." In the instant matter the parties agree that the third condition is the focus of concern.

The Supreme Court in *Garcia* recognized that the task of determining which state functions are immune is a very difficult one. In large part that is the very reason that the Court overruled *National League of Cities*. However, it remains this Court's burden to apply the rationale of *National League of Cities* to the instant matter.

In *National League of Cities*, the Court stated that:

> "[the] application [of the FLSA amendments] will ... significantly alter or displace the States' abilities to structure employer-employee relationships in such areas as fire prevention, police protection, sanitation, public health, and parks and recreation. These activities are typical of those performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services.[16] Indeed, it is functions such as these which governments are created to provide, services such as these which the States have traditionally afforded their citizens.

426 U.S. at 851, 96 S.Ct. at 2474.

In footnote 16, the Court noted:

> These examples are obviously not an exhaustive catalogue of the numerous line and support activities which are well within the area of traditional operations of the state and local governments.

*Id.*

And by overruling *Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), the Supreme Court in *National League of Cities* by implication held that the operation of public hospitals was also an immune government function.

It is clear that the operation of the ambulance service in question here was a public service like those enumerated in *National League of Cities* which are within the area of traditional operations, despite plaintiffs' contentions to the contrary. Plaintiffs, in particular, point to the fact that ambulance services were previously provided by private companies and are once again being provided by a private company. This court, however, finds plaintiffs' argument without merit. The City/Parish operated the ambulance service as a governmental function and not as a private enterprise.

As discussed above, prior to 1971, ambulance services in the City and Parish were provided by area funeral homes. By 1971, all of those funeral homes, due to economic necessity, had ceased to provide ambulance services. The people of the City and Parish were faced at that time with the possibility of being left without the benefit of an ambulance service, an important and essential service for the citizens of any community. The City and Parish governments, in response to the great community need for ambulance service, attempted to hire private ambulance companies from other regions of the state to extend their operations to the City of DeRidder and Beauregard Parish, but were unsuccessful. Faced with the possibility that the people of the City and Parish would go without the much needed ambulance service, the City and Parish governments were forced to set up their own jointly-operated ambulance service.

The service, over the 14 years that the City/Parish operated it, proved to be a

severe economic burden on the City/Parish and the government bodies sought a solution. They began, in 1983, to search for other means of providing the essential ambulance services to the community without the necessity of the governmental bodies having to incur the resultant economic losses. Eventually, the private ambulance company, Metropolitan, agreed to begin operation in the City and Parish, if the City/Parish donated the existing ambulances and equipment to Metropolitan. This was done and Metropolitan began operations, thus allowing the City/Parish Ambulance Service to discontinue its services as of June 22, · 1985. At all times, the City/Parish governments were concerned with making sure that their citizens had a continuous and adequate ambulance service available to meet their needs.

Even in overruling *National League of Cities*, the Supreme Court in *Garcia* recognized that other courts had found that the regulation of ambulance services is a protected government function under *National League of Cities*. *Garcia*, 105 S.Ct. at 1011. In *Gold Cross Ambulance v. City of Kansas City*, 538 F.Supp. 956 at 968 (W.D.Mo.1982), aff'd on other grounds, 705 F.2d 1005 (8th Cir.1983), *cert. denied* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985), it was held that the "operation of ambulance service is an exercise of a city's governmental function" necessary to protect its citizens and that it thus is within the general police power.

Here, the City/Parish governments, faced with a situation which endangered the health and safety of their citizens, took the only course of action available, stepping in to provide the essential ambulance service itself. The City/Parish governments did not discontinue their ambulance service until a private provider of services could be found. In fact, they had to make certain concessions for the new private operator to take over, namely that they donated their ambulances and equipment to the new operator. The City/Parish governments were only acting within their general police power.

In as much as the Court finds that the ambulance service was an immune government function under *National League of Cities*, the Court must hold that the defendants are not subject to the minimum wage and overtime provisions of the FLSA for the period prior to the Supreme Court's decision in *Garcia*.