Edmund G. BROWN, Jr., Governor of the State of California, et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

TRUSTEES OF the CALIFORNIA STATE UNIVERSITY & COLLEGES, etc., Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

CALIFORNIA AIR RESOURCES BOARD et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

Nos. 73–3306, 73–3305, 73–3307.

United States Court of Appeals, Ninth Circuit.

Aug. 15, 1975.

Joel Moskowitz (argued), Mark I. Weinberger, Deputy Attys. Gen. of Cal., Ronald A. Zumbrun, John H. Findley (argued), Glenn E. Davis, Pacific Legal Foundation, Sacramento, Cal., for petitioners.

Neil Proto (argued), Michael Graves (argued), Land & Natural Resources Div., Dept. of Justice, Washington, D. C., for respondent.

## OPINION

Before WRIGHT, KILKENNY and SNEED, Circuit Judges.

SNEED, Circuit Judge:

This is a proceeding growing out of numerous petitions for review of certain regulations of the Environmental Protection Agency. Petitioners included the Governor of the State of California, Trustees of the California State University and Colleges, the California Air Resources Board, numerous California cities and counties, private business concerns, and others. Certain of these petitioners filed consolidated briefs in which certain constitutional questions were raised. In due course, the Agency moved to expedite the hearing with respect to these constitutional issues. This motion was granted. Those petitioners seeking to present constitutional issues thereafter were directed to appear at a prehearing conference pursuant to Rule 33, Fed. R. App. P., at which the issues sought to be

raised were identified and the time to be allowed for oral argument was fixed. At this prehearing conference, the petitioners were informed that this Court contemplated entering a judgment regarding the constitutional issues pursuant to Rule 54(b), Fed. R. Civ. P., prior to a hearing on, or disposition of, such other issues as were raised by the petitioners. Oral argument on the constitutional issues has been heard and our disposition of them is set forth herein. Our jurisdiction to hear these petitions is based on Section 307(b) of the Clean Air Act.[1]

## I.

### The Background of This Proceeding

The controversy between the petitioners and the Administrator has its roots in the Clean Air Amendments of 1970.[2] Under these Amendments, California was required to submit for the approval of the Administrator a state plan providing for the implementation, maintenance, and enforcement of national ambient air quality standards,[3] including, if necessary, land-use and transportation controls.[4] California complied by submitting its plan on February 21, 1972.[5] The Administrator approved this plan in part and disapproved it in part on May 31, 1972.[6] Following a further revision by California and partial approval by the Administrator, there were promulgated rules by the Administrator on September 22, 1972, applicable to certain aspects of air pollution control.[7] These rules, however, did not purport to control photochemical oxidants.

This omission led to *City of Riverside v. Ruckelshaus,* 4 E.R.C. 1728 (C.D.Cal. 1972), a suit in the District Court for the Central District of California, in which the Administrator was ordered to promulgate regulations to control photochemical oxidants, including all necessary transportation controls and land-use controls, not later than January 15, 1973. The Administrator thereafter issued such regulations but, pursuant to discretion recognized by the court in *City of Riverside,* extended the time within which the national primary standard for photochemical oxidants in California could be attained for two years.[8]

Such extensions were held impermissible under the terms of the Clean Air Act in *National Resources Defense Council, Inc. v. Environmental Protection Agency,* 154 U.S.App.D.C. 384, 475 F.2d 968 (1973). The court directed the Administrator to inform the states which had not submitted an implementation plan enabling them to meet the primary standard by May 31, 1975 to submit such plans, including but not limited to land-use and transportation controls, not later than April 15, 1973. California failed to submit the required plan and the Administrator disapproved its previous plan because it did not provide for attainment and maintenance of the national standards for photochemical oxidants.[9] Thereafter, the Administrator promulgated a transportation control plan for California[10] which, together with the regulations promulgated pursuant to the mandate of the court in *City of River-*

---

**1.** 42 U.S.C.A. § 1857h–5(b) (West Supp.1975). In view of the issuance of a "Notice of Violation" by EPA to the State, which is the initial step in applying sanctions for non-compliance with EPA regulations, and in view of the interrelationship between the enforcement procedures and the substantive regulations contained in the EPA's implementation plan, the constitutional challenges here made are clearly ripe for adjudication. *See Pennsylvania v. Environmental Protection Agency,* 500 F.2d 246, 256 n.17 (3d Cir. 1974); and text *infra* at pp. 831, 832.

**2.** Act of Dec. 31, 1970, P.L. 91–604, 84 Stat. 1676, *amending* 42 U.S.C. § 1857 *et seq.* (Supp. V, 1969).

**3.** Clean Air Act § 110(a), 42 U.S.C.A. § 1857c–5(a) (West Supp.1975).

**4.** Clean Air Act § 110(a)(2)(B), 42 U.S.C.A. § 1857c–5(a)(2)(B) (West Supp.1975).

**5.** 37 Fed.Reg. 10851 (1972).

**6.** 37 Fed.Reg. 10852 (1972).

**7.** 37 Fed.Reg. 19812–15, 19829–35 (1972).

**8.** 38 Fed.Reg. 2194, 10851 (1973).

**9.** 38 Fed.Reg. 16550, 16556, 16564 (1973).

**10.** 38 Fed.Reg. 31232, *as corrected,* 38 Fed. Reg. 34124, 35467 (1973); 39 Fed.Reg. 1025, 1848 (1974).

*side, supra,* covered all of California's Air Quality Control Regions.

After concluding that attainment of the required ambient air quality standard for photochemical oxidants and carbon monoxide must be deferred until 1977 because the necessary technology or other alternatives are not available,[11] the Administrator's plan contemplated among other things, the reduction of gasoline sold within the Los Angeles, San Francisco, Sacramento Valley, San Joaquin Valley and San Diego Regions; the operation by the State of California of an inspection and maintenance program designed to reduce emissions from automobiles; limitations to be imposed by the State on the use of motorcycles; the institution by the State of an oxidizing catalyst retrofit program; control of dry cleaning solvent vapor losses; the imposition of · surcharges on parking spaces; the development of a procedure of review and approval of construction or modification of parking facilities; the establishment by the State of a computer-aided carpool matching system; and the fixing by the State of certain preferential bus and carpool lanes.[12] This plan specifically directed the State of California to undertake those tasks assigned to it, to report its compliance to the Agency, and, in the case of the inspection and maintenance program, to report the date by which the State would recommend any needed legislation and to submit "[a] signed statement from the Governor and State Treasurer identifying the sources and amounts of funds for the program" and the "text of needed legislation" if existing legislation does not authorize the funds which the program will re-

quire.[13] Other miscellaneous duties were imposed upon the State.[14] The Agency has made it clear that it believes it has the legal authority to bring civil actions or seek penalties against the states which fail to comply with its regulations.[15]

At least 208 parties petitioned this Court for a review of these actions within the 30-day period allowed by the Clean Air Act.[16] Many of these have been dismissed, but a large number are currently pending. In addition to certain revisions, the Administrator has suspended indefinitely the regulations pertaining to management of parking supply [17] and has withdrawn all parking surcharge regulations.[18] The indefinite suspension of the parking management regulations has enabled us to dismiss without prejudice a number of petitions which were directed to the validity of these regulations.[19]

Nonetheless the Administrator insists that the remainder of his regulations constitute a valid exercise of his authority and that his directions to the State of California contained therein must be obeyed. In keeping with this view, the Administrator on April 11, 1975 dispatched to California a "Notice of Violation" pursuant to Section 113(a)(1) of the Clean Air Act [20] for failure "to submit the compliance schedule or the adopted regulations establishing the inspection and maintenance program" required by the Administrator's regulations.

■ The Administrator, however, suggests that a determination regarding his authority under the Clean Air Act and

11. *See* Clean Air Act § 110(e)(1)(A), 42 U.S.C. § 1857c–5(e)(1)(A) (1970).

12. 38 Fed.Reg. 31232–55 (1973). The Agency's requirements are codified at 40 C.F.R. §§ 52.220–52.266 (1974).

13. 40 C.F.R. § 52.242(f). For similar requirements, *see, e.g.,* 40 C.F.R. §§ 52.243(f), 52.244(f), 52.257(e), 52.258(f), 52.259(g) (1974).

14. *E.g.,* 40 C.F.R. § 52.262 (1974) (status report on "corridor issues").

15. 38 Fed.Reg. 30632–33 (1973).

16. Clean Air Act § 307(b), 42 U.S.C.A. § 1857h–5(b) (West Supp.1975). The figure 208 is acknowledged by the Agency in its brief.

17. 40 Fed.Reg. 29713 (1975).

18. 39 Fed.Reg. 1848 (1974).

19. *California Business Properties Ass'n v. United States Environmental Protection Agency,* No. 73–3268 (9th Cir., August 15, 1975).

20. 42 U.S.C. § 1857c–8(a)(1) (1970).

the Constitution is not ripe at the present time because he has not instituted as yet the procedures necessary to invoke sanctions against the State of California. The sanctions include, the Administrator insists, injunctive relief,[21] imposing a receivership on certain state functions,[22] holding a state official in civil contempt with a substantial daily fine until compliance is secured,[23] and requiring a state to allocate funds from one portion of its budget to another in order to finance the undertakings required by the Agency.[24] The Agency disclaims any authority to seek criminal penalties against state legislators.[25] It also indicates that in the final analysis the fashioning of sanctions is within the discretion of the appropriate court. We do not believe any doctrine of ripeness or exhaustion of administrative remedies should preclude our determination of the issues raised in this proceeding by the State of California and others regarding the authority to impose the regulations with respect to which these petitions for review were filed. Such issues must be determined in this proceeding for it is unlikely they could be raised "in a civil or criminal proceeding for enforcement."[26] Moreover, the orderly administration of the Clean Air Act requires that the serious questions to which the parties have addressed themselves be resolved as expeditiously as possible.

The position of the State of California and the other petitioners in this proceeding is simply that the Clean Air Act does not authorize the Administrator to impose sanctions on the State or its officials for failure to comply with the regulations here being reviewed, and that any such attempt based on the Commerce Power would be unconstitutional. While we do not feel it necessary to embrace fully California's position, we do believe that the meaning of the Clean Air Act, insofar as the imposition[s] of sanctions is concerned, is sufficiently ambiguous to permit us to interpret it in a fashion that avoids the constitutional issues. Accordingly, we hold that the Clean Air Act does not authorize the imposition of sanctions on a state or its officials for failure to comply with the Administrator's regulations which direct the state to regulate the pollution-creating activities of those other than itself, its instrumentalities and subdivisions, and the municipalities within its borders. Specifically, we hold that the Clean Air Act does not authorize the imposition of sanctions for any failure of the State of California to comply with the directions contained in 40 C.F.R. § 52.22(a) (growth plans for maintenance of national standards); 40 C.F.R. § 52.242 (inspection and maintenance program); 40 C.F.R. § 52.243 (motorcycle limitation); 40 C.F.R. § 52.244 (oxidizing catalyst retrofit); 40 C.F.R. § 52.245 (control of oxides of nitrogen, hydrocarbon, and carbon monoxide emissions from in-use vehicles); 40 C.F.R. § 52.257 (computer carpool matching); 40 C.F.R. § 52.258 (mass transit priority-exclusive bus use); 40 C.F.R. § 52.259 (ramp metering and preferential bus/carpool lanes); 40 C.F.R. § 52.261 (preferential bus/carpool lanes, San Francisco Bay Area); 40 C.F.R. § 52.263 (priority treatment for buses and carpools, Los Angeles Region); 40 C.F.R. § 52.264 (mass transit priority strategy and planning); 40 C.F.R. § 52.-265 (mass transit and transit priority planning); and 40 C.F.R. § 52.266 (mass transit and transit priority planning). It follows that we consider 40 C.F.R. § 52.-23 (violations and enforcement) invalid

---

21. Clean Air Act § 113(b), 42 U.S.C. § 1857c–8(b) (Supp. III, 1973).

22. Cf. *Turner v. Goolsby,* 255 F.Supp. 724, 730, 733–34 (S. D. Ga. 1966).

23. *Harvest v. Board of Public Instruction,* 312 F.Supp. 269, 278 (M.D. Fla. 1970).

24. *Wyatt v. Stickney,* 344 F.Supp. 373, 377–78 (M.D. Ala. 1972), *aff'd, Wyatt v. Aderholt,* 503 F.2d 1305, 1316 (5th Cir. 1974).

25. Cf. *Gravel v. United States,* 408 U.S. 606, 616, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1971).

26. *See* Clean Air Act § 307(b)(2), 42 U.S.C. § 1857h–5(b)(2) (1970), and note 1 *supra.*

to the extent it is contrary to this holding.

■■ Our holding recognizes that the pollution-creating activities of the State of California, its instrumentalities and subdivisions, and its municipalities, are subject to valid regulations promulgated by the Administrator. We also recognize that the State must avoid impeding any enforcement of valid regulations which the Administrator undertakes. We reject, however, the view that the Clean Air Act authorizes the imposition of sanctions against the State for its failure to administer and enforce a system of regulations promulgated by the Administrator which are designed to control the pollution-creating activities of the citizens of the State and others subject to its jurisdiction. Tersely put, the Act, as we see it, permits sanctions against a state that pollutes the air, but not against a state that chooses not to govern polluters as the Administrator directs.

In support of this proposition, we shall examine those portions of the Clean Air Act upon which the Administrator relies and demonstrate that the Act does not unambiguously vest him with the powers he here asserts. Thereafter, we shall examine the constitutional difficulties which the Administrator's view encoun-

ters and which induce us to reject his interpretation of his powers.[27]

## II.

### Interpretation of the Act

The Clean Air Act as amended[28] is both lengthy and complex. It is divided into four subchapters designated "Air Pollution Prevention and Control," "Motor Vehicle Emission Standards," "General Provisions," and "Noise Pollution." As already indicated, the controversy between the Administrator and the State of California before us grows out of section 110(c)(1) of the Act,[29] which empowers the Administrator to promulgate an implementation plan if the plan submitted by a state is not "in accordance with the requirements of this section."[30] The Administrator contends that having promulgated such a plan the Act empowers him to impose sanctions on the State, or at least on the administrative officials of the State, should it or they fail to administer and enforce the plan. It is clear that the Administrator's regulation, 40 C.F.R. § 52.23, so provides.[31]

The statutory authority for this regulation is by no means apparent. The most likely place in the Act for such authority to be found would seem to be section 113 of the Clean Air Act,[32] which

---

**27.** To support his interpretation, the Administrator relies upon *Weinberger v. Bentex Pharmaceutical, Inc.,* 412 U.S. 645, 653, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Mitchell v. DeMario Jewelry,* 361 U.S. 288, 291–92, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960); *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936); *South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646 (1st Cir. 1974); *Pennsylvania v. Environmental Protection Agency,* 500 F.2d 246, 263 (3d Cir. 1974); *Powell v. Katzenbach,* 123 U.S.App.D.C. 250, 359 F.2d 234, 235 (1965), *cert. denied,* 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 369 (1966); 5 B.N.A. "Environmental Reporter—Current Developments" 755 (Sept. 20, 1974); and cases cited notes 22–25 *supra.*

**28.** 42 U.S.C.A. § 1857 *et seq.* (West Supp. 1975) (Chap. 15B–Air Pollution Control).

**29.** 42 U.S.C.A. § 1857c–5 (West Supp.1975).

**30.** Clean Air Act § 110(c)(1)(B), 42 U.S.C.A. § 1857c–5(c)(1)(B) (West Supp.1975).

**31.** 40 C.F.R. § 52.23 (1974) provides:

Failure to comply with any provisions of this part shall render the person or Governmental entity so failing to comply in violation of a requirement of an applicable implementation plan and subject to enforcement action under Section 113 of the Clean Air Act. With regard to compliance schedules, a person or Governmental entity will be considered to have failed to comply with the requirements of this part if it fails to timely submit any required compliance schedule, if the compliance schedule when submitted does not contain each of the elements it is required to contain, or if the person or Governmental entity fails to comply with such schedule. [38 Fed.Reg. 30633 (1973).]

**32.** 42 U.S.C.A. § 1857c–8 (West Supp.1975).

deals with "Federal enforcement procedures." More particularly, this authority should appear in subsection (a)(2) which deals with the situation in which violations of implementation plans "appear to result from a failure of the State in which the plan applies to enforce the plan effectively."[35] It does not unambiguously so appear. The subsection first provides that if the "Administrator finds such failure extends beyond the 30th day after such notice, he shall give public notice of such finding." Thereafter, it provides that during the period of the State's recalcitrance or neglect, "the Administrator may enforce any requirement of such plan with respect to any person—(A) by issuing an order to comply with such requirement, or (B) by bringing a civil action under subsection (b) of this section." The Administrator contends that, inasmuch as the term "person" is defined in subsection 302(e)[34] to include a state, municipality, or political subdivision, subsection 113(a)(2) authorizes a civil action against a recalcitrant state. Moreover, he contends that subsections (b)[35] and (c)[36] of section 113

**33.** Clean Air Act § 113(a)(2), 42 U.S.C. § 1857c–8(a)(2) (1970) provides:

(2) Whenever, on the basis of information available to him, the Administrator finds that violations of an applicable implementation plan are so widespread that such violations appear to result from a failure of the State in which the plan applies to enforce the plan effectively, he shall so notify the State. If the Administrator finds such failure extends beyond the 30th day after such notice, he shall give public notice of such finding. During the period beginning with such public notice and ending when such State satisfies the Administrator that it will enforce such plan (hereafter referred to in this section as "period of federally assumed enforcement"), the Administrator may enforce any requirement of such plan with respect to any person—
(A) by issuing an order to comply with such requirement, or
(B) by bringing a civil action under subsection (b) of this section.

**34.** 42 U.S.C. § 1857h(e) (1970).

**35.** Clean Air Act § 113(b), 42 U.S.C.A. § 1857c–8(b) (West Supp.1975) provides:

(b) The Administrator may commence a civil action for appropriate relief, including a permanent or temporary injunction, whenever any person—
(1) violates or fails or refuses to comply with any order issued under subsection (a) of this section; or
(2) violates any requirements of an applicable implementation plan (A) during any period of Federally assumed enforcement, or (B) more than 30 days after having been notified by the Administrator under subsection (a)(1) of this section of a finding that such person is violating such requirement; or
(3) violates section 1857c—6(e), 1857c—7(c), or 1857c—10(g) of this title; or
(4) fails or refuses to comply with any requirement of section 1857c—9 of this title.

Any action under this subsection may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to restrain such violation and to require compliance. Notice of the commencement of such action shall be given to the appropriate State air pollution control agency.

**36.** Clean Air Act § 113(c), 42 U.S.C.A. § 1857c–8(c) (West Supp.1975) provides:

(c)(1) Any person who knowingly—
(A) violates any requirement of an applicable implementation plan (i) during any period of Federally assumed enforcement, or (ii) more than 30 days after having been notified by the Administrator under subsection (a)(1) of this section that such person is violating such requirement, or
(B) violates or fails or refuses to comply with any order issued by the Administrator under subsection (a) of this section, or
(C) violates section 1857c—6(e), section 1857c—7(c), or section 1857c—10(g) of this title shall be punished by a fine of not more than $25,000 per day of violation, or by imprisonment for not more than one year, or by both. If the conviction is for a violation committed after the first conviction of such person under this paragraph, punishment shall be by a fine of not more than $50,000 per day of violation, or by imprisonment for not more than two years, or by both.
(2) Any person who knowingly makes any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under this chapter or who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under this chapter; shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than six months, or by both.

which impose sanctions also are applicable to states because of their use of the term "person."

■ We disagree. While we are not prepared to say that under no circumstances should the term "person" be read to include a state when used in connection with a sanction-imposing provision of the Act, we are convinced that section 113(a)(2) is designed to provide the Administrator with power to enforce against polluters provisions of an implementation plan not being enforced by the state. Moreover, we are not convinced that the section is designed to equip the Administrator with power to sanction the non-enforcing state.

Our lack of conviction on this point primarily is grounded in our belief that Congress would not have intended in this obscure manner to take such a step in the light of the delicacy with which federal-state relations always have been treated by all branches of the Federal government. In addition, we should be reluctant to interpret expansively a provision such as subsection 113(a)(2) when by doing so we encounter fundamental constitutional questions. We also find comfort in the fact that in subsection 113(a)(1), as well as within subsection 113(a)(2),[37] the term "State" is employed in a manner that distinguishes it from the term "person." That is, in subsection 113(a)(1) the Administrator must notify both the "person" in violation of a plan and the "State" in which the plan being violated applies. In subsection 113(a)(2) when a "State" fails to enforce the plan effectively, the Administrator may enforce it against "any person." Had Congress intended the term "person" in that context to include the

"State," the natural language to have employed would have been as follows:

During the period beginning with such public notice and ending when such State satisfies the Administrator that it will enforce such plan (hereinafter referred to in this section as "period of federally assumed enforcement"), the Administrator may enforce any requirement of such plan with respect to any person [, including the State so failing to enforce the plan effectively]—

The language in brackets is missing from the text of section 113(a)(2) and we decline to read it in by way of the statutory definition of the term "person." The Administrator had no difficulty in making clear his intention to impose sanctions on states not enforcing effectively implementation plans.[38] Congress can be expected to have no less capacity for clarity.

As we see it, subsections 113(a)(1) and (a)(2) are designed to vest the Administrator with power to enforce a state implementation plan should the state fail to do so. This parallels the Administrator's power to promulgate an implementation plan for a state which fails to prepare a suitable plan.[39] A diligent search of the sections of the Clean Air Act fails to reveal a single instance in which Congress explicitly has vested in the Administrator power to compel the states to administer and enforce regulations promulgated by him designed to govern polluters, potential or actual, other than the state, municipality, or political subdivision of the state. Counsel for the Administrator also have been unable to guide us to such a provision. This

**37.** Clean Air Act § 113(a)(1), 42 U.S.C. § 1857c–8(a)(1) (1970) provides:

(a)(1) Whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of any requirement of an applicable implementation plan, the Administrator shall notify the person in violation of the plan and the State in which the plan applies of such finding. If such violation extends beyond the 30th day after the date of the Administrator's notifica-

tion, the Administrator may issue an order requiring such person to comply with the requirements of such plan or he may bring a civil action in accordance with subsection (b) of this section.

**38.** *See* note 31 *supra.*

**39.** Clean Air Act § 110(c)(1), 42 U.S.C.A. § 1857c–5(c)(1) (West Supp.1975).

strengthens our belief that the function of subsections 113(a)(1) and (a)(2) is as we perceive it to be.

Viewed generally, the structure of the Clean Air Act reflects a genuine effort to develop an elaborate form of cooperative federalism in which both the Federal government and the states are assigned vital roles. Techniques such as preemption, total and partial,[40] delegations to the states of federal authority,[41] and the creation of opportunities for states to participate in the task of controlling air pollution[42] are employed. We find this complex structure incompatible with the view that buried within section 113 is the Congressional intent to make the states departments of the Environmental Protection Agency no less obligated to obey its Administrator's command than are its subordinate officials.

We readily acknowledge that our reading of section 113 and our perception of the structure of the Act is not unambiguously supported by the applicable legislative history. On the other hand, we have found nothing that marks our interpretation as plainly erroneous. An important example of the ambiguity that characterizes the relevant history is the following colloquy between Senator Eagleton of Missouri and Senator Muskie of Maine following the presentation by Senator Muskie of the Conference Report on the Clean Air Amendments of 1970. Senator Eagleton, in commenting on "the significance and the parameters of this noteworthy piece of legislation," said,

I think we should also pause to record that this bill also marks a very significant step forward in the continuing development of more responsive and responsible relationships among the Federal Government and the State and local governments of our country . . . Would the Senator from Maine agree that this bill has very broad significance in the area of Federal-State relations?

Senator Muskie's reply was imprecise:

Yes. May I say to the Senator that during the deliberations on this bill I have been very much interested in preserving "local option" features . . . In my judgment, the bill will give State and local authorities sufficient latitude in selecting ways to prevent and control air pollution.

116 Cong. Rec. 42386 (1970).

Another example of this ambiguity is the following excerpt pertaining to section 113 taken from the Senate Report:

If the Secretary should find a State or local control agency not acting to abate violations of implementation plans or to enforce certification requirements, he would be expected to use the full force of Federal law. Also, the Secretary should apply the penalty provisions of this section to the maximum extent necessary to underwrite the strong public demand for abatement of air pollution and to enforce compliance with the provisions of the Act.

If the Secretary and State and local agencies should fail their responsibility, the public would be guaranteed the right to seek vigorous enforcement action under citizen suit provisions of section 304 [42 U.S.C. § 1857h–2 (1970)].

40. Clean Air Act § 119(f), 42 U.S.C.A. § 1857c–10(f) (West Supp.1975) (unavailable fuels use requirements); Clean Air Act § 209(a), 42 U.S.C. § 1857f–6a(a) (1970) (new motor vehicle emission standards); Clean Air Act § 211(c)(4)(A), 42 U.S.C. § 1857f–6c(c)(4)(A) (1970) (fuel use controls); Clean Air Act § 233, 42 U.S.C. § 1857f–11 (1970) (aircraft emission standards).

41. E.g., Clean Air Act § 107(a), 42 U.S.C. § 1857c–2a (1970) (responsibility for assuring air quality); Clean Air Act § 111(c), 42 U.S.C.

§ 1857c–6(a) (1970) (power to implement and enforce standards of performance); Clean Air Act § 112(d), 42 U.S.C. § 1857c–7(d) (1970) (power to implement and enforce emission standards for hazardous air pollutants); Clean Air Act § 211(c)(4)(B)–(C), 42 U.S.C. § 1857f–6c(c)(4)(B)–(C) (1970) (power to prescribe and enforce vehicle emission controls).

42. E.g., Clean Air Act § 210, 42 U.S.C. § 1857f–6b (1970) (grants for developing and maintaining inspection and control programs).

S.Rep. No.91–1196, 91st Cong., 2d Sess. 20 (1970). While it is possible to read this as the Administrator insists we should, it is far more natural and reasonable to read it as indicating that the Administrator had ample power to enforce an implementation plan when a state has failed to do so.

Supporting this view of the Act is the following comment appearing in the House Report with respect to the House version of what became section 113 of the Act:

> Whenever the Secretary finds that as a result of the failure of a State to enforce the plan applicable to such State, any ambient air quality standard is not met, the Secretary is directed to notify the affected State or States, persons not in compliance with the plan and other interested parties. If the failure of the State to take action extends beyond the 30 days after the Secretary's notification, the Secre-

tary may request the Attorney General to bring suit on behalf of the United States in the appropriate U. S. district court to secure abatement of the pollution.

H.R.Rep. No.91–1146, 91st Cong., 2d Sess. 8 (1970), U.S.Code Cong. & Admin.News, 1970, pp. 5356–5364.

While the House version was significantly different from section 113 as enacted, it is by no means clear that section 113 intended to lump ineffectively-enforcing states with polluters and subject each of them to the same far-ranging set of remedies provided by that section. To so intend indicates an insensitivity to the delicacy of federal-state relations which neither is reflected in other portions of the Act nor is worthy of Congress.

This recital of inconclusive bits of legislative history could be continued; however, we limit it to a few additional examples set forth in the margin.[43]

**43.** Congressman Springer, during presentation of the House Report, said,

> The bill provides . . . that State governments will create plans for the implementation and enforcement of the air standards. In fact a State may declare more stringent standards if it feels necessary. . . . [But i]f a State hangs back and fails to move out, the Federal Government will take over and make rules and regulations amounting to a State plan. Machinery for forcing a plan upon a State is spelled out including penalties of $10,000 a day for failing to act.

116 Cong.Rec. 19206 (1970).
Congressman Vanik, during the same debate, said,

> Further, if a State fails to enforce its plan, the Secretary of Health, Education, and Welfare can notify the State and persons who violate the plan. If, after such notice, the State fails to act within 30 days, the Secretary . . . may request the Attorney General of the United States to bring suit to secure abatement and cessation of the pollution. A court may then assess a fine of up to $10,000 a day for each day during which the polluter fails to take corrective action.

116 Cong.Rec. 19218 (1970).
The Senate Committee on Public Works reported:

> If the Secretary should find that a State or local pollution control agency is not acting to abate violations of implementation plans or to enforce certification requirements, he

> would be expected to use the full force of Federal law. Also, the Secretary should apply the penalty provisions of this section to the maximum extent necessary to underwrite the strong public demand for abatement of air pollution and to enforce compliance with the provisions of this Act.

S.Rep. No.91–1196, 91st Cong., 2d Sess. 20 (1970).
But Senator Muskie, the floor manager of the Senate bill, inserted this summary of provisions into the record:

> Federal enforcement under section 113 leaves the primary responsibility with the States for enforcing requirements under implementation plans. The administrator can issue an abatement order to a polluter or go to court seeking an injunction only after 30 days' notice to an individual polluter, or 30 days after notifying the State that the Federal Government is generally assuming enforcement powers in that State because of a widespread failure of States' enforcement. This gives States 30 days in which to take appropriate action themselves.

116 Cong.Rec. 42385 (1970).
The Senate Report, on the other hand, said this:

> The new section [section 116, State retention of authority] prohibits and provides for the enforcement of any violation by any person, as the term is defined in section 302 of the Act, of any applicable implementation plan, including any emission requirements forming a part of the plan, or any emission standard

Enough has been said to demonstrate why we do not feel compelled by the language of the Act to reach the serious constitutional issues which the Administrator's interpretation raises. Validation of our interpretation, however, requires that we set forth these issues and, by suggesting our evaluation of them, reveal the intensity of our desire to avoid confronting them. To this task we now turn.

## III.

### Constitutional Issues

The Administrator contends that his interpretation encounters no constitutional barriers. Planting himself on Chief Justice Marshall's expansive definition of the power of Congress to regulate commerce set forth in *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), he then points to that Chief Justice's classic statement of the Necessary and Proper Clause: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). On these foundations, the Administrator correctly asserts, were built the decisions in *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), and *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964),

in which activities, otherwise local in scope and character, which exert a "substantial effect on interstate commerce" were held subject to regulation under the Commerce Power.

The emission of air pollutants without regard to their source, the Administrator asserts, has been found by Congress to exert the requisite effect on interstate commerce. This finding, moreover, cannot be said to be without a "rational basis." Having the power to regulate air pollution, the Administrator continues, Congress, under the Necessary and Proper Clause, has the power to direct that state officials either incorporate in the law of their state or administer and enforce on behalf of the Federal Government those regulations designed to control air pollution which are properly promulgated by the Administrator. The end (abatement of air pollution) is legitimate; it (the power to regulate air emissions) is within the scope of the Constitution; and the means (state administration and enforcement) are appropriate, plainly adapted to the end, which is not prohibited, and consistent with the letter and spirit of the Constitution.

States by reason of their position under the Constitution are not immune from federal regulation under the Commerce Power, continues the Administrator. This has been established, he points out, by *United States v. California*, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936), *Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), *Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975). It was

or standard of performance, or procedural requirement established under the Act.
S.Rep. No.91–1196, 91st Cong., 2d Sess. 57 (1970).
Finally, the House Committee on Interstate and Foreign Commerce reported:
If at any time the Secretary determines that any person is violating the emission standards or that the State or interstate agency is failing to carry out such plan, the Secretary is directed to notify the agencies as well as the violator, and specify the time within which such violation must cease. If the violation does not cease within such time, the Secretary may request the Attorney General

to bring suit on behalf of the United States in the appropriate U.S. district court to secure abatement of the pollution. The court may enter such judgment as the public interest and the equities of the case may require. Also, the court may assess a penalty of up to $10,000 for each day of violation after the time specified by the Secretary for the cessation of the violation. In determining the amount of such penalty, the court is directed to take into account the efforts of the defendant to abate the pollution involved.
H.R.Rep. No.91–1146, 91st Cong., 2d Sess. 9–10 (1970), U.S.Code Cong. & Admin.News 1970, p. 5366.

838

put in *Maryland v. Wirtz, supra,* as follows:

> But while the commerce power has limits, valid general regulations of commerce do not cease to be regulations of commerce because a State is involved. If a State is engaging in economic activities that are validly regulated by the Federal Government when engaged in by private persons, the State too may be forced to conform its activities to federal regulation.

392 U.S. at 196, 197, 88 S.Ct. at 2024. This regulation includes the power to direct that a state either enact such laws to control air pollution as the Administrator might require, or administer and enforce such regulations as the Administration might properly promulgate. The state, as a builder of roads, maker of traffic laws, licensor of vehicles, is no more immune from this form of coercion, says the Administrator, than is a state-owned railroad exempt from the duty to comply with Federal safety regulations.[44] *See United States v. California,* 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936).

The petitioners sharply challenge this reading of the Commerce Power. Their fundamental contention is that the Commerce Power does not extend to requiring a state to undertake such *governmental* tasks as might be assigned to it by Congress, or its proper delegate, with respect to activities which admittedly are within the reach of the Commerce Power. The Constitution's Tenth Amendment and Article IV, Section 4, which

obligates the United States to guarantee to every state a Republican Form of Government, precludes such an extension of the Commerce Power, assert the petitioners. Moreover, insofar as the Necessary and Proper Clause is concerned, the petitioners contend that the means, compulsory state administration and enforcement, is inappropriate and inconsistent with the letter and spirit of the Constitution.

We do not view these contentions as frivolous. Moreover, we are certain that neither *Maryland v. Wirtz* nor *Fry v. United States* passed upon the precise issues raised by the petitioners. These cases establish that the payment of wages by states to certain types of state employees is an economic activity that substantially affects interstate commerce and is thus subject to those regulations imposed by Congress which were then before the Court. Neither of these cases holds or even suggests that a state's exercise of its police power with respect to an economic activity which affects interstate commerce is itself an economic activity or "species of commercial intercourse" subject to regulation by Congress. *See Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1 (1824). Nor do we believe that it is proper to equate the operation by a state of a railroad, an *economic activity* indistinguishable from that of private parties, with its *governance* of the use of highways and automobiles, an exercise of its police power with respect to commerce.[45]

---

**44.** For an exposition of this view by the Administrator, *see* 38 Fed.Reg. 30632–33 (1973).

**45.** We recognize that our views both with regard to the interpretation of the Clean Air Act and the constitutional issues here discussed differ from those expressed in *Pennsylvania v. Environmental Protection Agency,* 500 F.2d 246 (3d Cir. 1974). With regard to the latter issues, we believe with all deference that the Third Circuit failed to recognize the difference between a state engaging in commerce, as all states must under the Supreme Court's interpretation of the Commerce Power, and a state's regulation of the commerce of others. This failure is reflected in the following passage, at 261:

> This reasoning indicates that the basis for the Court's decision in *Maryland v. Wirtz, supra,* is the principle that the constitutionality of federal regulation of state activities is subject to the same analyses as that of private activities; *viz.* the determinative factor is simply whether they have an impact on interstate commerce. Following this principle, we believe that the Administrator acted within the federal commerce power in requiring the Commonwealth to enforce its transportation plan.

The conclusion is a non sequitur. The principle deduced from *Maryland v. Wirtz* far exceeds its holding in our respectful opinion. We cannot believe that a careful craftsman

The *power of states over commerce* has no more been recognized as *commerce* than has the *power of Congress which is derived from the Commerce Clause.* Each find their source in the Constitution. Both are of the same family and genus, although not of the same species. The power of the states must yield to Federal power in order to effectuate Federal supremacy, not because the power of the states is commerce. This distinction between commerce and governmental power to regulate commerce, we suggest, was recognized by Mr. Chief Justice Hughes when he observed, "The subject of federal power is still 'commerce,' and not all commerce but commerce with foreign nations and among the several states." *Santa Cruz Co. v. Labor Board,* 303 U.S. 453, 466, 58 S.Ct. 656, 660, 82 L.Ed. 954 (1937). We also believe that Mr. Justice Harlan recognized this distinction in *Maryland v. Wirtz, supra,* 392 U.S. at 196, 88 S.Ct. at 2024, when he quoted Mr. Chief Justice Hughes' observation to demonstrate that the Commerce Power would not disable the Court from preventing "the utter destruction of the State as a sovereign political entity."

To treat the governance of commerce by the states as within the plenary reach of the Commerce Power would in our opinion represent such an abrupt departure from previous constitutional practice as to make us reluctant to adopt an interpretation of the Clean Air Act which would force us to confront the issue. Such treatment, for example, would authorize Congress to direct the states to regulate any economic activity that affects interstate commerce in any manner Congress sees fit. While such an interpretation might not enable Congress to direct the enactment or enforcement of a federal probate code, there is sufficient doubt about even that to illumine the breadth of the sweeping claim here being made by the Administrator. To make *governance* indistinguishable from *commerce* for the purposes of the

Commerce Power cannot be equated to the "unintrusive" regulation of economic activities of the states upheld by the Supreme Court in *Maryland v. Wirtz* and *Fry v. United States.* A Commerce Power so expanded would reduce the states to puppets of a ventriloquist Congress. We will not attribute to Congress any such intent unless it is expressed unequivocally. As we have already pointed out, that was not done in the Clean Air Act.

To emphasize our reluctance to embrace the Administrator's interpretation, we wish to underscore that he is not merely insisting that the state's exercise of its police power must not improperly burden interstate commerce. *See Pike v. Bruce Church,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Bibb v. Navajo Freight Lines Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). With this proposition no one differs. Nor is the Administrator merely insisting that in the area of control of air pollution federal law has preempted state law. *See, e.g., Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Campbell v. Hussey,* 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). The petitioners do not question the right of Congress to exclude states from participating in regulating interstate commerce.

Neither of these doctrines, if applied in a conventional manner, supports the Administrator's position. To provide such support, they must be distorted almost beyond recognition. Preemption must be invoked to eliminate a free exercise of state power, and the doctrine of unconstitutional burdens must be read to proscribe all state activities, *including abandonment to the Federal Government*

---

like Mr. Justice Harlan intended in *Maryland v. Wirtz* to announce a principle so clearly

inconsistent with the history of our federal structure.

*of all regulatory responsibility*, other than obedience to the Administrator's will. We are aware of no such version of these doctrines.

We hasten to point out that our reluctance to accept the Administrator's interpretation of the Act is not an effort at this late date to ignore Chief Justice Marshall's triumph over Mr. Jefferson with regard to the power of the Federal government *vis-a-vis* the states. Our concern, as we believe was Chief Justice Marshall's, is to preserve and protect a strong government of the United States and viable governments of the states. As we see it, our interpretation of the Act is more compatible with these objectives than that of the Administrator.

Our interpretation, moreover, does not deprive the Administrator of power to regulate air pollution in the manner provided by the Act. We merely hold that under the Act a state may decline, without becoming liable to sanctions, to undertake a program of control suggested by the Administrator; a state, however, may not interfere with such regulation of the sources of pollution as the Administrator pursuant to the Act undertakes. Our interpretation is in no way inconsistent with the recognition that Congress has the power to authorize the Administrator to obtain the consent of a reluctant state by conditioning certain federal expenditures within that state on the granting of such consent. *See Steward Machine Co. v. Davis*, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). Nor should our constitutional concerns be interpreted as disfavoring a determination by Congress that the states may regulate certain aspects of commerce which have an effect on interstate commerce only in certain specified ways *if a state chooses to regulate that aspect of commerce at all*. We are, however, adopting an interpretation which makes it unnecessary for us to face the issue of whether Congress can prevent a state's withdrawal from the field.

Confrontation with this issue would require us to consider the effect such a power would have on the structure of the United States. Its existence, we suspect, would enable Congress to control ever increasing portions of the states' budgets. The pattern of expenditures by states would increasingly become a Congressional responsibility. The maintenance of tax revenues at the state level would be deterred by the realization of the people of each state that their control of the expenditures of such revenues increasingly was passing from their hands. Their likely responses would be, first, to demand increased federal subventions, whether in the form of revenue-sharing or otherwise, and, second, to earmark state tax receipts for purposes over which the state has complete control. Neither response is consistent with either healthy federalism or sound public finance.

This severance of spending from taxing at the state level in our view does suggest that the petitioners are not irresponsible when they strongly suggest that the Republican Form of Government of the states would be seriously impaired. The power of each voter of each state over state expenditures, to the extent not supplied by the Federal government, would be less than his power over state taxation. Voters of other states, acting through their representatives in Congress, would dilute the strength of the voters of the states whose revenues would be spent as Congress directs. A structure in which all power on the part of states to spend was vested in Congress while the power and obligation to tax remained with the states would encourage few even casually acquainted with the writings of Montesquieu and the *Federalist* papers to assert that the states enjoyed a Republican Form of Government. Nor could such an assertion be made were all taxation and expenditure responsibility to reside in the Federal government. The limited severance of spending from taxing which the Administrator's interpretation of the Act and the Constitution would permit, therefore, should not be viewed as unrelated to the Guarantee Clause.

We do not consider our hesitancy to embrace the Administrator's interpretation as being in any way inconsistent with the obligation of the state courts, recognized by Mr. Justice Story in *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816), to enforce and recognize the supremacy of valid federal law as interpreted by the Supreme Court. As Mr. Justice Story points out, this obligation was understood by the Founding Fathers and is imbedded in the Constitution. No such plain command exists in the Constitution to support the Administrator's reading of the Commerce Power. Our constitutional practice has been quite contrary to his reading. In this regard, we find particularly revealing the following words of the late Professor Henry M. Hart, Jr., written as recently as 1954:

> Federal law often says to the states, "Don't do any of these things," leaving outside the scope of its prohibition a wide range of alternative courses of action. But it is illuminating to observe how rarely it says, "Do *this* thing," leaving no choice but to go ahead and do it. The *Federalist* papers bear ample witness to the Framers' awareness of the delicacy, and the difficulties of enforcement, of affirmative mandates from a federal government to the governments of the member states.

The Constitution counts upon the necessary participation of the states in the electoral process not by direct command but by the incentive of not losing the opportunity of participation. In similar fashion Congress now elicits desired affirmative performances from the states by attaching them as conditions to the receipt of federal grants-in-aid. If we search the Constitution for provisions which have the appearance of affirmative requirements, two of the most striking are those which call for the surrender of fugitive slaves and fugitives from justice. But the first was disembowelled by the *tour de force* of *Prigg v. Pennsylvania* [41 U.S. (16 Pet.) 539, 10 L.Ed. 1060],

and the second was flatly held, in *Kentucky v. Denison* [65 U.S. (24 How.) 66, 16 L.Ed. 717], to be judicially unenforceable. "And we think it clear," said Chief Justice Taney in the latter case, "that the Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it." Taney's statement can stand today, if we accept from it certain primary duties of state judges and occasional remedial duties of other state officers. Both exceptions, it will be observed, involve enforcement through the orderly and ameliorating forms of the judicial process. In any event, experience with the exceptions does little to bring into question the principle of the rule.

The judges of the state courts are not only sworn to support the Constitution, like other state officers, but are bound also to observance of federal law by the special direction of the supremacy clause. This may on occasion require them, specifically and affirmatively, to enter a particular judgment, as in complying, for example, with the injunction of the full faith and credit clause. State courts ordinarily fulfil such obligations without question. But Congress nevertheless has recognized the possibility of conflict and authorized the Supreme Court, in its discretion, to avoid it by entering judgment itself. The imbroglio of *Martin v. Hunter's Lessee* suggests the wisdom of making this alternative available.

Judicial mandates to non-judicial state officers to enforce either primary or remedial duties requiring the performance of affirmative acts are relatively infrequent. Lower federal courts may *prohibit* state officers, in their individual capacity, from taking action under color of office in violation of law. But an action to compel the performance of an affirmative act would encounter, ordinarily, the bar of the Eleventh Amendment. Whether a writ of mandamus to compel perform-

ance of a ministerial duty would be regarded as an action against the state is not altogether clear. But it is significant that a practice of issuing such writs to state officers has never become established.

Hart, *The Relations Between State and Federal Law*, 54 Colum.L.R. 515–16 (1954) (footnotes omitted).

Finally, we are encouraged by the Supreme Court's footnote 7 in *Fry v. United States*. In describing the Tenth Amendment, it was said in the footnote:

The [Tenth] Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system.

421 U.S. at 547 n. 7, 95 S.Ct. at 1795. Moreover the Supreme Court in *Maryland v. Wirtz* observed:

The Court has ample power to prevent what the appellants purport to fear, "the utter destruction of the State as a sovereign political entity."

392 U.S. at 196, 88 S.Ct. at 2024.

It is our task, where possible, to avoid a statutory interpretation which would require us to decide whether the extensive control of state expenditures, which the Administrator's view would permit, does either threaten "the utter destruction of the State as a sovereign political entity," or "impair the States' integrity or their ability to function effectively in a federal system." As we have made abundantly clear, we are sufficiently apprehensive about the ability of states "to function effectively in a federal system" under the Administrator's interpretation to justify our strong preference for an interpretation that puts our concerns at rest. In addition, we reject as a means of allaying our fears the assumption that the prospect of "utter destruction of the State as a sovereign political entity" is confronted only when Congress asserts the power to regulate *all* aspects of state and local government. Only the mischievous

would contend that not until then is the issue ripe.

All efforts by the Administrator to impose sanctions on the State of California are stayed to the extent indicated in this opinion. To that extent the petitions for review are granted.

Pursuant to Rule 54(b), Fed.R.Civ.P., to the extent that there remain unresolved claims presented by the petitioners, the disposition of the issues set forth herein shall be treated as a final judgment with respect to fewer than all the claims presented by the petitioners and we expressly determine that there is no just reason for delay in entering such final judgment with respect to the claims of which this opinion disposes.

Petitions for review granted in part.