Justice Thomas,
dissenting.
Respondents Diane Monson and Angel Raich use marijuana that has never been bought or sold, that has never crossed state lines, and that has had no demonstrable effect on the national market for marijuana. If Congress can reg *58 ulate this under the Commerce Clause, then it can regulate virtually anything — and the Federal Government is no longer one of limited and enumerated powers.
I
Respondents’ local cultivation and consumption of marijuana is not “Commerce . . . among the several States.” U. S. Const., Art. I, § 8, cl. 3. By holding that Congress may regulate activity that is neither interstate nor commerce under the Interstate Commerce Clause, the Court abandons any attempt to enforce the Constitution’s limits on federal power. The majority supports this conclusion by invoking, without explanation, the Necessary and Proper Clause. Regulating respondents’ conduct, however, is not “necessary and proper for carrying into Execution” Congress’ restrictions on the interstate drug trade. Art. I, §8, cl. 18. Thus, neither the Commerce Clause nor the Necessary and Proper Clause grants Congress the power to regulate respondents’ conduct.
A
As I explained at length in United States v. Lopez, 514 U. S. 549 (1995), the Commerce Clause empowers Congress to regulate the buying and selling of goods and services trafficked across state lines. Id., at 586-589 (concurring opinion). The Clause’s text, structure, and history all indicate that, at the time of the founding, the term “ ‘commerce’ consisted of selling, buying, and bartering, as well as transporting for these purposes.” Id., at 585 (Thomas, J., concurring). Commerce, or trade, stood in contrast to productive activities like manufacturing and agriculture. Id., at 586-587 (Thomas, J., concurring). Throughout founding-era dictionaries, Madison’s notes from the Constitutional Convention, The Federalist Papers, and the ratification debates, the term “commerce” is consistently used to mean trade or exchange — not all economic or gainful activity that has some attenuated connection to trade or exchange. Ibid. (Thomas, *59 J., concurring); Barnett, The Original Meaning of the Commerce Clause, 68 U. Chi. L. Rev. 101, 112-125 (2001). The term “commerce” commonly meant trade or exchange (and shipping for these purposes) not simply to those involved in the drafting and ratification processes, but also to the general public. Barnett, New Evidence of the Original Meaning of the Commerce Clause, 55 Ark. L. Rev. 847, 857-862 (2003).
Even the majority does not argue that respondents’ conduct is itself “Commerce among the several States,” Art. I, § 8, el. 3. Ante, at 22. Monson and Raich neither buy nor sell the marijuana that they consume. They cultivate their cannabis entirely in the State of California — it never crosses state lines, much less as part of a commercial transaction. Certainly no evidence from the founding suggests that “commerce” included the mere possession of a good or some purely personal activity that did not involve trade or exchange for value. In the early days of the Republic, it would have been unthinkable that Congress could prohibit the local cultivation, possession, and consumption of marijuana.
On this traditional understanding of “commerce,” the Controlled Substances Act (CSA), 21 U. S. C. §801 et seq., regulates a great deal of marijuana trafficking that is interstate and commercial in character. The CSA does not, however, criminalize only the interstate buying and selling of marijuana. Instead, it bans the entire market — intrastate or interstate, noncommercial or commercial — for marijuana. Respondents are correct that the CSA exceeds Congress’ commerce power as applied to their conduct, which is purely intrastate and noncommercial.
B
More difficult, however, is whether the CSA is a valid exercise of Congress’ power to enact laws that are “necessary and proper for carrying into Execution” its power to regulate interstate commerce. Art. I, §8, cl. 18. The Necessary *60 and Proper Clause is not a warrant to Congress to enact any law that bears some conceivable connection to the exercise of an enumerated power.[1] Nor is it, however, a command to Congress to enact only laws that are absolutely indispensable to the exercise of an enumerated power.[2]
In McCulloch v. Maryland, 4 Wheat. 316 (1819), this Court, speaking through Chief Justice Marshall, set forth a test for determining when an Act of Congress is permissible under the Necessary and Proper Clause:
“Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.” Id., at 421.
To act under the Necessary and Proper Clause, then, Congress must select a means that is “appropriate” and “plainly adapted” to executing an enumerated power; the means cannot be otherwise “prohibited” by the Constitution; and the means cannot be inconsistent with “the letter and spirit of the [Constitution.” Ibid.; D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789-1888, pp. 163-164 (1985). The CSA, as applied to respondents’ conduct, is not a valid exercise of Congress’ power under the Necessary and Proper Clause.
1
Congress has exercised its power over interstate commerce to criminalize trafficking in marijuana across state *61 lines. The Government contends that banning Monson and Raich’s intrastate drug activity is “necessary and proper for carrying into Execution” its regulation of interstate drug trafficking. Art. I, § 8, cl. 18. See 21 U. S. C. §801(6). However, in order to be “necessary,” the intrastate ban must be more than “a reasonable means [of] effectuat[ing] the regulation of interstate commerce.” Brief for Petitioners 14; see ante, at 22 (majority opinion) (employing rational-basis review). It must be “plainly adapted” to regulating interstate marijuana trafficking — in other words, there must be an “obvious, simple, and direct relation” between the intrastate ban and the regulation of interstate commerce. Sabri v. United States, 541 U. S. 600, 613 (2004) (Thomas, J., concurring in judgment); see also United States v. Dewitt, 9 Wall. 41, 44 (1870) (finding ban on intrastate sale of lighting oils not “appropriate and plainly adapted means for carrying into execution” Congress’ taxing power).
On its face, a ban on the intrastate cultivation, possession, and distribution of marijuana may be plainly adapted to stopping the interstate flow of marijuana. Unregulated local growers and users could swell both the supply and the demand sides of the interstate marijuana market, making the market more difficult to regulate. Ante, at 12-13, 22 (majority opinion). But respondents do not challenge the CSA on its face. Instead, they challenge it as applied to their conduct. The question is thus whether the intrastate ban is “necessary and proper” as applied to medical marijuana users like respondents.[3]
Respondents are not regulable simply because they belong to a large class (local growers and users of marijuana) that *62 Congress might need to reach, if they also belong to a distinct and separable subclass (local growers and users of state-authorized, medical marijuana) that does not undermine the CSA’s interstate ban. Ante, at 47-48 (O’Connor, J., dissenting). The Court of Appeals found that respondents’ “limited use is clearly distinct from the broader illicit drug market,” because “th[eir] medicinal marijuana... is not intended for, nor does it enter, the stream of commerce.” Raich v. Ashcroft, 352 F. 3d 1222, 1228 (CA9 2003). If that is generally true of individuals who grow and use marijuana for medical purposes under state law, then even assuming Congress has “obvious” and “plain” reasons why regulating intrastate cultivation and possession is necessary to regulating the interstate drug trade, none of those reasons applies to medical marijuana patients like Monson and Raich.
California’s Compassionate Use Act sets respondents’ conduct apart from other intrastate producers and users of marijuana. The Act channels marijuana use to “seriously ill Californians,” Cal. Health & Safety Code Ann. § 11362.5(b)(1)(A) (West Supp. 2005), and prohibits “the diversion of marijuana for nonmedical purposes,” § 11362.5(b)(2).[4] California strictly controls the cultivation and possession of marijuana for medical purposes. To be eligible for its program, California requires that a patient have an illness that cannabis can relieve, such as cancer, AIDS, or arthritis, § 11362.5(b)(1)(A), and that he obtain a physician’s recommendation or approval, § 11362.5(d). Qualified patients must provide personal and medical information to obtain medical identification cards, and there is a statewide registry of cardholders. §§11362.715-11362.76. Moreover, the Medical Board of California has issued guidelines for physicians’ cannabis recommendations, and it sanctions physicians who do not comply with the guidelines. *63 See, e. g., People v. Spark, 121 Cal. App. 4th 259, 263, 16 Cal. Rptr. 3d 840, 843 (2004).
This class of intrastate users is therefore distinguishable from others. We normally presume that States enforce their own laws, Riley v. National Federation of Blind of N. C., Inc., 487 U. S. 781, 795 (1988), and there is no reason to depart from that presumption here: Nothing suggests that California’s controls are ineffective. The scant evidence that exists suggests that few people — the vast majority of whom are aged 40 or older — register to use medical marijuana. General Accounting Office, Marijuana: Early Experiences with Four States’ Laws That Allow Use for Medical Purposes 22-23 (Rep. No. 03-189, Nov. 2002), http://www. gao.gov/new.items/d03189.pdf (all Internet materials as visited June 3, 2005, and available in Clerk of Court’s case file). In part because of the low incidence of medical marijuana use, many law enforcement officials report that the introduction of medical marijuana laws has not affected their law enforcement efforts. Id., at 32.
These controls belie the Government’s assertion that placing medical marijuana outside the CSA’s reach “would prevent effective enforcement of the interstate ban on drug trafficking.” Brief for Petitioners 33. Enforcement of the CSA can continue as it did prior to the Compassionate Use Act. Only now, a qualified patient could avoid arrest or prosecution by presenting his identification card to law enforcement officers. In the event that a qualified patient is arrested for possession or his cannabis is seized, he could seek to prove as an affirmative defense that, in conformity with state law, he possessed or cultivated small quantities of marijuana intrastate solely for personal medical use. People v. Mower, 28 Cal. 4th 457, 469-470, 49 P. 3d 1067, 1073-1075 (2002); People v. Trippet, 56 Cal. App. 4th 1532, 1549, 66 Cal. Rptr. 2d 559, 560 (1997). Moreover, under the CSA, certain drugs that present a high risk of abuse and addiction but that nevertheless have an accepted medical use — drugs like mor *64 phine and amphetamines — are available by prescription. 21 U. S. C. §§ 812(b)(2)(AMB); 21 CFR § 1308.12 (2004). No one argues that permitting use of these drugs under medical supervision has undermined the CSA’s restrictions.
But even assuming that States’ controls allow some seepage of medical marijuana into the illicit drug market, there is a multibillion-dollar interstate market for marijuana. Executive Office of the President, Office of Nat. Drug Control Policy, Marijuana Fact Sheet 5 (Feb. 2004), http://www. whitehousedrugpolicy.gov/publications/factsht/marijuana/ index.html. It is difficult to see how this vast market could be affected by diverted medical cannabis, let alone in a way that makes regulating intrastate medical marijuana obviously essential to controlling the interstate drug market.
To be sure, Congress declared that state policy would disrupt federal law enforcement. It believed the across-the-board ban essential to policing interstate drug trafficking. 21 U. S. C. §801(6). But as Justice O’Connor points out, Congress presented no evidence in support of its conclusions, which are not so much findings of fact as assertions of power. Ante, at 53-55 (dissenting opinion). Congress cannot define the scope of its own power merely by declaring the necessity of its enactments.
In sum, neither in enacting the CSA nor in defending its application to respondents has the Government offered any obvious reason why banning medical marijuana use is necessary to stem the tide of interstate drug trafficking. Congress’ goal of curtailing the interstate drug trade would not plainly be thwarted if it could not apply the CSA to patients like Monson and Raich. That is, unless Congress’ aim is really to exercise police power of the sort reserved to the States in order to eliminate even the intrastate possession and use of marijuana.
2
Even assuming the CSA’s ban on locally cultivated and consumed marijuana is “necessary,” that does not mean it is *65 also “proper.” The means selected by Congress to regulate interstate commerce cannot be “prohibited” by, or inconsistent with the “letter and spirit” of, the Constitution. McCulloch, 4 Wheat., at 421.
In Lopez, I argued that allowing Congress to regulate intrastate, noncommercial activity under the Commerce Clause would confer on Congress a general “police power” over the Nation. 514 U. S., at 584, 600 (concurring opinion). This is no less the case if Congress ties its power to the Necessary and Proper Clause rather than the Commerce Clause. When agents from the Drug Enforcement Administration raided Monson’s home, they seized six cannabis plants. If the Federal Government can regulate growing a half-dozen cannabis plants for personal consumption (not because it is interstate commerce, but because it is inextricably bound up with interstate commerce), then Congress’ Article I powers — as expanded by the Necessary and Proper Clause — have no meaningful limits. Whether Congress aims at the possession of drugs, guns, or any number of other items, it may continue to “appropriate] state police powers under the guise of regulating commerce.” United States v. Morrison, 529 U. S. 598, 627 (2000) (Thomas, J., concurring).
Even if Congress may regulate purely intrastate activity when essential to exercising some enumerated power, see Dewitt, 9 Wall., at 44; but see Barnett, The Original Meaning of the Necessary and Proper Clause, 6 U. Pa. J. Const. L. 183, 186 (2003) (detailing statements by Founders that the Necessary and Proper Clause was not intended to expand the scope of Congress’ enumerated powers), Congress may not use its incidental authority to subvert basic principles of federalism and dual sovereignty. Printz v. United States, 521 U. S. 898, 923-924 (1997); Alden v. Maine, 527 U. S. 706, 732-733 (1999); Garcia v. San Antonio Metropolitan Transit Authority, 469 U. S. 528, 585 (1985) (O’Connor, J., dissenting); The Federalist No. 33, pp. 204-205 (J. Cooke ed. 1961) (A. Hamilton) (hereinafter The Federalist).
*66 Here, Congress has encroached on States’ traditional police powers to define the criminal law and to protect the health, safety, and welfare of their citizens.[5] Brecht v. Abrahamson, 507 U. S. 619, 635 (1993); Hillsborough County v. Automated Medical Laboratories, Inc., 471 U. S. 707, 719 (1985). Further, the Government’s rationale — that it may regulate the production or possession of any commodity for which there is an interstate market — threatens to remove the remaining vestiges of States’ traditional police powers. See Brief for Petitioners 21-22; cf. Ehrlich, The Increasing Federalization of Crime, 32 Ariz. St. L. J. 825, 826, 841 (2000) (describing both the relative recency of a large percentage of federal crimes and the lack of a relationship between some of these crimes and interstate commerce). This would convert the Necessary and Proper Clause into precisely what Chief Justice Marshall did not envision, a “pretext... for the accomplishment of objects not intrusted to the government.” McCulloch, supra, at 423.
*67 II
The majority advances three reasons why the CSA is a legitimate exercise of Congress’ authority under the Commerce Clause: First, respondents’ conduct, taken in the aggregate, may substantially affect interstate commerce, ante, at 22; second, regulation of respondents’ conduct is essential to regulating the interstate marijuana market, ante, at 24-25; and, third, regulation of respondents’ conduct is incidental to regulating the interstate marijuana market, ante, at 22. Justice O’Connor explains why the majority’s reasons cannot be reconciled with our recent Commerce Clause jurisprudence. The majority’s justifications, however, suffer from even more fundamental flaws.
A
. The majority holds that Congress may regulate intrastate cultivation and possession of medical marijuana under the Commerce Clause, because such conduct arguably has a substantial effect on interstate commerce. The majority’s decision is further proof that the “substantial effects” test is a “rootless and malleable standard” at odds with the constitutional design. Morrison, supra, at 627 (Thomas, J., concurring).
The majority’s treatment of the substantial effects test is rootless, because it is not tethered to either the Commerce Clause or the Necessary and Proper Clause. Under the Commerce Clause, Congress may regulate interstate commerce, not activities that substantially affect interstate commerce, any more than activities that do not fall within, but that affect, the subjects of its other Article I powers. Lopez, 514 U. S., at 589 (Thomas, J., concurring). Whatever additional latitude the Necessary and Proper Clause affords, supra, at 65-66, the question is whether Congress’ legislation is essential to the regulation of interstate commerce itself — not whether the legislation extends only to economic *68 activities that substantially affect interstate commerce. Supra, at 60-61; ante, at 37 (Scalia, J., concurring in judgment).
The majority’s treatment of the substantial effects test is malleable, because the majority expands the relevant conduct. By defining the class at a high level of generality (as the intrastate manufacture and possession of marijuana), the majority overlooks that individuals authorized by state law to manufacture and possess medical marijuana exert no demonstrable effect on the interstate drug market. Supra, at 64. The majority ignores that whether a particular activity substantially affects interstate commerce — and thus comes within Congress’ reach on the majority’s approach— can turn on a number of objective factors, like state action or features of the regulated activity itself. Ante, at 47-48 (O’Connor, J., dissenting). For instance, here, if California and other States are effectively regulating medical marijuana users, then these users have little effect on the interstate drug trade.[6]
The substantial effects test is easily manipulated for another reason. This Court has never held that Congress can *69 regulate noneconomic activity that substantially affects interstate commerce. Morrison, 529 U. S., at 613 (“[T]hus far in our Nation’s history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature” (emphasis added)); Lopez, supra, at 560. To evade even that modest restriction on federal power, the majority defines economic activity in the broadest possible terms as “‘the production, distribution, and consumption of commodities.’”[7] Ante, at 25 (quoting Webster’s Third New International Dictionary 720 (1966) (hereinafter Webster’s 3d)). This carves out a vast swath of activities that are subject to federal regulation. See ante, at 49-50 (O’Connor, J., dissenting). If the majority is to be taken seriously, the Federal Government may now regulate quilting bees, clothes drives, and potluck suppers throughout the 50 States. This makes a mockery of Madison’s assurance to the people of New York that the “powers delegated” to the Federal Government are “few and defined,” while those of the States are “numerous and indefinite.” The Federalist No. 45, at 313.
Moreover, even a Court interested more in the modern than the original understanding of the Constitution ought to resolve cases based on the meaning of words that are actually in the document. Congress is authorized to regulate “Commerce,” and respondents’ conduct does not qualify under any definition of that term.[8] The majority’s opinion *70 only illustrates the steady drift away from the text of the Commerce Clause. There is an inexorable expansion from “ ‘[commerce/ ” ante, at 5, to “commercial” and “economic” activity, ante, at 23, and finally to all “production, distribution, and consumption” of goods or services for which there is an “established ... interstate market,” ante, at 26. Federal power expands, but never contracts, with each new locution. The majority is not interpreting the Commerce Clause, but rewriting it.
The majority’s rewriting of the Commerce Clause seems to be rooted in the belief that, unless the Commerce Clause covers the entire web of human activity, Congress will be left powerless to regulate the national economy effectively. Ante, at 18-19; Lopez, 514 U. S., at 573-574 (Kennedy, J., concurring). The interconnectedness of economic activity is not a modern phenomenon unfamiliar to the Framers. Id., at 590-593 (Thomas, J., concurring); Letter from J. Madison to S. Roane (Sept. 2, 1819), in 3 The Founders’ Constitution 259-260 (P. Kurland & R. Lerner eds. 1987). Moreover, the Framers understood what the majority does not appear to fully appreciate: There is a danger to concentrating too much, as well as too little, power in the Federal Government. This Court has carefully avoided stripping Congress of its ability to regulate interstate commerce, but it has casually allowed the Federal Government to strip States of their ability to regulate mirastate commerce — not to mention a host of local activities, like mere drug possession, that are not commercial.
One searches the Court’s opinion in vain for any hint of what aspect of American life is reserved to the States. Yet this Court knows that “ ‘[t]he Constitution created a Federal Government of limited powers.’” New York v. United States, 505 U. S. 144, 155 (1992) (quoting Gregory v. Ashcroft, *71 501 U. S. 452, 457 (1991)). That is why today’s decision will add no measure of stability to our Commerce Clause jurisprudence: This Court is willing neither to enforce limits on federal power, nor to declare the Tenth Amendment a dead letter. If stability is possible, it is only by discarding the stand-alone substantial effects test and revisiting our definition of “Commerce... among the several States.” Congress may regulate interstate commerce — not things that affect it, even when summed together, unless truly “necessary and proper” to regulating interstate commerce.
B
The majority also inconsistently contends that regulating respondents’ conduct is both incidental and essential to a comprehensive legislative scheme. Ante, at 22, 24-25. I have already explained why the CSA’s ban on local activity is not essential. Supra, at 64. However, the majority further claims that, because the CSA covers a great deal of interstate commerce, it “is of no moment” if it also “ensnares some purely intrastate activity.” Ante, at 22. So long as Congress casts its net broadly over an interstate market, according to the majority, it is free to regulate interstate and intrastate activity alike. This cannot be justified under either the Commerce Clause or the Necessary and Proper Clause. If the activity is purely intrastate, then it may not be regulated under the Commerce Clause. And if the regulation of the intrastate activity is purely incidental, then it may not be regulated under the Necessary and Proper Clause.
Nevertheless, the majority terms this the “pivotal” distinction between the present case and Lopez and Morrison. Ante, at 23. In Lopez and Morrison, the parties asserted facial challenges, claiming “that a particular statute or provision fell outside Congress’ commerce power in its entirety.” Ante, at 23. Here, by contrast, respondents claim only that the CSA falls outside Congress’ commerce power as applied *72 to their individual conduct. According to the majority, while courts may set aside whole statutes or provisions, they may not “excise individual applications of a concededly valid statutory scheme.” Ibid.; see also Perez v. United States, 402 U. S. 146, 154 (1971); Maryland v. Wirtz, 392 U. S. 183, 192-193 (1968).
It is true that if respondents’ conduct is part of a “class of activities . . . and that class is within the reach of federal power,” Perez, supra, at 154 (emphasis deleted), then respondents may not point to the de minimis effect of their own personal conduct on the interstate drug market, Wirtz, supra, at 196, n. 27. Ante, at 47 (O’Connor, J., dissenting). But that begs the question at issue: whether respondents’ “class of activities” is “within the reach of federal power,” which depends in turn on whether the class is defined at a low or a high level of generality. Supra, at 61-62. If medical marijuana patients like Monson and Raich largely stand outside the interstate drug market, then courts must excise them from the CSA’s coverage. Congress expressly provided that if “a provision [of the CSA] is held invalid in one or more of its applications, the provision shall remain in effect in all its valid applications that are severable.” 21 U. S. C. § 901 (emphasis added); see also United States v. Booker, 543 U. S. 220, 320-321, and n. 9 (2005) (Thomas, J., dissenting in part).
Even in the absence of an express severability provision, it is implausible that this Court could set aside entire portions of the United States Code as outside Congress’ power in Lopez and Morrison, but it cannot engage in the more restrained practice of invalidating particular applications of the CSA that are beyond Congress’ power. This Court has regularly entertained as-applied challenges under constitutional provisions, see United States v. Raines, 362 U. S. 17, 20-21 (1960), including the Commerce Clause, see Katzenbach v. McClung, 379 U. S. 294, 295 (1964); Heart of Atlanta *73 Motel, Inc. v. United States, 379 U. S. 241, 249 (1964); Wickard v. Filburn, 317 U. S. 111, 113-114 (1942), There is no reason why, when Congress exceeds the scope of its commerce power, courts may not invalidate Congress’ overreaching on a case-by-case basis. The CSA undoubtedly regulates a great deal of interstate commerce, but that is no license to regulate conduct that is neither interstate nor commercial, however minor or incidental.
If the majority is correct that Lopez and Morrison are distinct because they were facial challenges to “particular statute[s] or provision[s],” ante, at 23, then congressional power turns on the manner in which Congress packages legislation. Under the majority’s reasoning, Congress could not enact — either as a single-subject statute or as a separate provision in the CSA — a prohibition on the intrastate possession or cultivation of marijuana. Nor could it enact an intrastate ban simply to supplement existing drug regulations. However, that same prohibition is perfectly constitutional when integrated into a piece of legislation that reaches other regulable conduct. Lopez, 514 U. S., at 600-601 (Thomas, J., concurring).
Finally, the majority’s view — that because some of the CSA’s applications are constitutional, they must all be constitutional — undermines its reliance on the substantial effects test. The intrastate conduct swept within a general regulatory scheme may or may not have a substantial effect on the relevant interstate market. “[0]ne always can draw the circle broadly enough to cover an activity that, when taken in isolation, would not have substantial effects on commerce.” Id., at 600 (Thomas, J., concurring). The breadth of legislation that Congress enacts says nothing about whether the intrastate activity substantially affects interstate commerce, let alone whether it is necessary to the scheme. Because medical marijuana users in California and elsewhere are not placing substantial amounts of cannabis *74 into the stream of interstate commerce, Congress may not regulate them under the substantial effects test, no matter how broadly it drafts the CSA.
* * *
The majority prevents States like California from devising drug policies that they have concluded provide much-needed respite to the seriously ill. It does so without any serious inquiry into the necessity for federal regulation or the propriety of “displacing] state regulation in areas of traditional state concern,” id., at 583 (Kennedy, J., concurring). The majority’s rush to embrace federal power “is especially unfortunate given the importance of showing respect for the sovereign States that comprise our Federal Union.” United States v. Oakland Cannabis Buyers’ Cooperative, 532 U. S. 483, 502 (2001) (Stevens, J., concurring in judgment). Our federalist system, properly understood, allows California and a growing number of other States to decide for themselves how to safeguard the health and welfare of their citizens. I would affirm the judgment of the Court of Appeals. I respectfully dissent.

 McCulloch v. Maryland, 4 Wheat. 316, 419-421 (1819); Madison, The Bank Bill, House of Representatives (Feb. 2, 1791), in 3 The Founders’ Constitution 244 (P. Kurland & R. Lerner eds. 1987) (requiring “direct” rather than “remote” means-end fit); Hamilton, Opinion on the Constitutionality of the Bank (Feb. 23,1791), in id., at 248, 250 (requiring “obvious” means-end fit, where the end was “clearly comprehended within any of the specified powers” of Congress).

 McCulloch, supra, at 413-415; D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789-1888, p. 162 (1985).

 Because respondents do not challenge on its face the CSA’s ban on marijuana, 21 U. S. C. §§ 841(a)(1), 844(a), our adjudication of their as-applied challenge casts no doubt on this Court’s practice in United States v. Lopez, 514 U. S. 549 (1995), and United States v. Morrison, 529 U. S. 598 (2000). In those cases, we held that Congress, in enacting the statutes at issue, had exceeded its Article I powers.

 Other States likewise prohibit diversion of marijuana for nonmedical purposes. See, e. g., Colo. Const., Art. XVIII, § 14(2)(d); Nev. Rev. Stat. §§453A.300(1)(eMf) (2003); Ore. Rev. Stat. §§475.316(1)(c)-(d) (2003).

 Remarkably, the majority goes so far as to declare this question irrelevant. It asserts that the CSA is constitutional even if California’s current controls are effective, because state action can neither expand nor contract Congress’ powers. Ante, at 29-30, n. 38. The majority’s assertion is misleading. Regardless of state action, Congress has the power to regulate intrastate economic activities that substantially affect interstate commerce (on the majority’s view) or activities that are necessary and proper to effectuating its commerce power (on my view). But on either approach, whether an intrastate activity falls within the scope of Congress’ powers turns on factors that the majority is unwilling to confront. The majority apparently believes that even if States prevented any medical marijuana from entering the illicit drug market, and thus even if there were no need for the CSA to govern medical marijuana users, we should uphold the CSA under the Commerce Clause and the Necessary and Proper Clause. Finally, to invoke the Supremacy Clause, as the majority does, ante, at 29, n. 38, is to beg the question. The CSA displaces California’s Compassionate Use Act if the CSA is constitutional as applied to respondents’ conduct, but that is the very question at issue.

 Other dictionaries do not define the term “economic” as broadly as the majority does. See, e. g., The American Heritage Dictionary of the English Language 583 (3d ed. 1992) (defining “economic” as “[o]f or relating to the production, development, and management of material wealth, as of a country, household, or business enterprise” (emphasis added)). The majority does not explain why it selects a remarkably expansive 40-year-old definition.

 See, e. g., id., at 380 (“[t]he buying and selling of goods, especially on a large scale, as between cities or nations"); The Random House Dictionary of the English Language 411 (2d ed. 1987) (“an interchange of goods or commodities, esp. on a large scale between different countries ... or be *70 tween different parts of the same country”); Webster’s 3d 456 (“the exchange or buying and selling of commodities esp. on a large scale and involving transportation from place to place”).